## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **SOCIETY FOR THE PRESERVATION AND ENCOURAGEMENT OF BARBER SHOP QUARTET SINGING IN AMERICA, INCORPORATED., a Wisconsin, non-stock corporation d/b/a the Barbershop Harmony Society and HARMONY FOUNDATION INTERNATIONAL, INC., a Wisconsin, non-stock trust corporation,** | **CASE NO:** |
| | **COMPLAINT** |
| | **(JURY TRIAL DEMANDED)** |
| **Plaintiffs** | |
| **vs.** | |
| **GARY PLAAG, and certain unnamed persons acting in concert with him,** | |
| **Defendants.** | |

Plaintiffs the Society for the Preservation and Encouragement of Barber Shop Quartet Singing in America, Incorporated (the "Barbershop Harmony Society," "BHS," or the "Society") and Harmony Foundation International, Inc. ("HFI" or the "Foundation" and, collectively with BHS, "Plaintiffs") by and through their attorneys, for their complaint against Defendant Gary Plaag ("Defendant") and certain unnamed persons acting in concert with him (collectively "Defendants"), allege the following:

### INTRODUCTION

1.    Plaintiffs bring this lawsuit and assert claims against Defendant Plaag and those acting in concert with him for breaches of fiduciary duty and violations of Wisconsin Statute § 181.0855(1)(d).  In addition, Plaintiffs seek declarations from this Court (a) determining the proper members of the Board of Trustees of HFI ("BoT") and the nature and extent of certain governance rights in favor of BHS as explicitly stated in HFI's Bylaws and practiced by BHS and HFI for over six decades; (b) resolving what Bylaws currently govern HFI; (c) verifying the

1

existence of a trust over the property held by HFI and establishing the contours of what property is included within said trust; (d) stating Defendant Plaag has unlawfully attempted to, and/or directed HFI representatives to use BHS's HARMONY FOUNDATION trademark in ways that do not inure to the benefit of BHS and that exceed the scope of the license agreement between BHS and HFI; and (e) confirming that Defendant Plaag is not entitled to indemnification from HFI for any fees, costs, charges, disbursements, attorney fees, damages, and/or other expenses he incurred, and/or will incur, in connection with this legal proceeding.

## PARTIES

2.   Plaintiff BHS is a Wisconsin non-stock corporation with its principal place of business in Nashville, Tennessee.  BHS's mission is "to bring people together in harmony and fellowship to enrich lives through singing."

3.   Plaintiff HFI is a Wisconsin non-stock, non-profit charitable trust corporation with its principal place of business in Nashville, Tennessee. Since 1997, HFI has operated as the fundraising arm of BHS. HFI is governed by the BoT consisting of twenty-five members, all elected by the BHS Board of Directors (the "Society Board of Directors" or "SBOD").  This litigation is authorized by a majority of the HFI BoT against certain other members of the HFI BoT who have refused to recognize the elected majority.

4.   Defendant Gary Plaag is an individual residing in Boone, North Carolina.  Plaag is the current chairman of the HFI BoT.

5.   For Defendant Plaag to have taken certain actions after March 22, 2020, it is necessary for at least five of the nine HFI BoT members who were in office before that date to support Plaag's actions and positions. As alleged herein, Plaintiffs believe Plaag and has systematically misled and denied information to his co-members. Plaintiffs further believe that at least some of the members of the BoT in office before March 22, 2020 do not support what Plaag has done. If five of the

2

members in office before March 22, 2020 were to agree with Plaintiffs' position in this litigation,
then could make an agreement with Plaintiffs and much of this case could become moot. Unless
and until that time, Plaintiffs name as Defendants the unknown five members who presumably
support Plaag as "certain unnamed persons acting in concert" with him (also referred to in this
Complaint as "others acting in concert with him").

6.   The parties' relationship is summarized in the chart (below) and further-described in
this Complaint.

Plaintiff, Society for the Preservation and Encouragement
of Barber Shop Quartet Singing in America, Incorporated
("Barbershop Harmony Society," "BHS," or the "Society")

• Managed by the SBOD or the Society Board of Directors
• Holds the Harmony Foundation trademark

BHS's Governance Rights:
1. Elects all BoT members
2. Amends HFI's Bylaws
3. Veto right over any
   proposed change to
   HFI's Bylaws
4. HFI must make annual
   reports to BHS

Plaintiff, Harmony Foundation International, Inc.
("HFI" or the "Foundation")

• Managed by the BoT
• Defendant, Gary Plaag is current chairman of BoT
• "all" of HFI's property is held in trust to benefit BHS
  and its broader mission.

## JURISDICTION AND VENUE

7.   This is an action between citizens of different states where the matter in controversy
exceeds the sum or value of $75,000, exclusive of interest and costs.  This Court has subject matter
jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.

8.   This Court has personal jurisdiction over Defendant Plaag and others acting in concert with him under Wisconsin's long-arm statute, Wis. Stat. Ann. § 801.05, which authorizes courts in Wisconsin to exercise jurisdiction over nonresident defendants where the action arises out of the defendants' conduct as an officer, director or manager of a Wisconsin company.  This Court's exercise of jurisdiction over Defendant Plaag and others acting in concert with him comports with due process requirements because this action arises out of wrongdoing Defendant Plaag and others acting in concert with him have committed in their official capacity as directors of a Wisconsin non-stock corporation.

9.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## NATURE OF THE ACTION

10. BHS created HFI as a related company in 1958 to be the charitable and philanthropic subsidiary of the Society and to hold and manage certain property of the Society.

11. HFI has always functioned as a related company and been interrelated with and ultimately under the control of BHS. For example, the latest HFI financial statement provides: "The Foundation's Board consists of nine Trustees that are elected by the Board of Directors of Barbershop Harmony Society. Therefore, the two organizations are considered to be financially interrelated. Accordingly, the Foundation is included in the consolidated financial statements of the Barbershop Harmony Society, which is the principal reporting entity."

12. For over six decades, the relationship between BHS and HFI has been governed by a Trust Agreement, first-entered into by both parties on July 3, 1959, and by HFI's Bylaws, which adopted and continue to adopt the Trust Agreement in full and made and continue to make the Trust Agreement a part of the HFI Bylaws. A true and correct copy of the Trust Agreement, as amended January 29, 2009, and in effect as of March 22, 2020 is attached hereto as **Exhibit A**

("Trust Agreement"). A true and correct copy of the HFI Bylaws, as amended January 29, 2009, and in effect as of March 22, 2020, is attached hereto as **Exhibit B** ("HFI Bylaws" or "Bylaws").

13. The HFI Bylaws further provide that the duty of HFI's BoT is to manage the trust estate created by the Trust Agreement in accordance with the terms of the Trust Agreement and to exercise the powers granted to the BoT by the Trust Agreement.

14. Article VII of the Trust Agreement, which is itself a part of the HFI Bylaws, specifically provides that a majority of the SBOD may amend the Trust Agreement, and thus also amend the HFI Bylaws. The HFI BoT does not need to approve any such amendments unless the amendment changes the "tenure, duties, or liability of [BoT members]."

15. In addition to the specific rights within the Trust Agreement, which is itself part of the HFI Bylaws, the HFI Bylaws also expressly give certain powers to BHS, including the right of the SBOD to elect BoT members. The HFI Bylaws furthermore state that they may not be amended without the approval of the SBOD. In this complaint, Plaintiffs refer to these rights and related provisions in HFI's constitutive documents favoring BHS as BHS's "governance rights."

16. In their relationship with each other, BHS and HFI have operated as related companies and according to the terms of the Trust Agreement and the HFI Bylaws for over six decades, including as recently as January 2020, when HFI submitted three nominations to the SBOD for election to the HFI BoT.

17. From 1964 until approximately 2000, HFI's primary role, other than holding certain BHS assets, was to receive donations from members that were then forwarded to the Institute of Logopedics / Heartspring, which was the Society's international service project.

18. On October 3, 1974, BHS applied for federal registration of a service mark with the United States Patent and Trademark Office ("USPTO") for the HARMONY FOUNDATION mark (Ser. No. 73033615) ("HARMONY FOUNDATION® Mark").

19. On May 4, 1976, BHS was granted a federal registration for the HARMONY FOUNDATION® Mark by the USPTO (Reg. No. 1038974) in connection with "association services – namely, promoting barber shop singing to aid eleemosynary activities." ("HARMONY FOUNDATION Services"). On July 11, 2006, the USPTO published in the Official Gazette and issued to BHS a Corrected Certificate of Registration for the HARMONY FOUNDATION® Mark, correcting a previous typographical error. ("HARMONY FOUNDATION® Registration"). A true and correct copy of the HARMONY FOUNDATION® Registration is attached hereto as **Exhibit C**.

20. On May 10, 1982, the USPTO accepted BHS's Section 8 Declaration showing continued use of the HARMONY FOUNDATION® Mark in connection with the HARMONY FOUNDATION Services, and at the same time, the USPTO acknowledged receipt of BHS's Section 15 Declaration, rendering U.S. Reg. No. 1038974 for the HARMONY FOUNDATION® Mark incontestable pursuant to 15 U.S.C. §1065.

21. BHS's incontestable rights in the HARMONY FOUNDATION® Mark and the HARMONY FOUNDATION® Registration constitute conclusive evidence of: (a) The validity of the HARMONY FOUNDATION® Mark and the HARMONY FOUNDATION® Registration, (b) BHS's ownership of the HARMONY FOUNDATION® Mark and the HARMONY FOUNDATION® Registration, and (c) BHS's exclusive right to use the HARMONY FOUNDATION® Mark in United States commerce.

22. The HARMONY FOUNDATION® Registration was duly renewed by the USPTO following BHS's timely requests and submissions for additional ten-year terms, on each of the following dates: August 29, 1996, July 10, 2006, and July 22, 2016. Attached hereto as **Exhibit D** is a true and correct copy of the most recent Section 8 & 9 Declaration showing continued use of the HARMONY FOUNDATION® Mark in connection with the HARMONY FOUNDATION

Services dated May 3, 2016 and accepted by the USPTO on July 22, 2016. BHS's HARMONY FOUNDATION® Registration is not due for renewal again at the USPTO until May 4, 2026.

23. At all material times, BHS has been the registered and conclusive owner of the HARMONY FOUNDATION® Mark and the HARMONY FOUNDATION® Registration.  BHS remains the registered and conclusive owner of the HARMONY FOUNDATION trademark today.

24. Before 1997, HFI did not have any employees.  Following a series of reviews, task force reports, operational audits, and changes and amendments to the Trust Agreement, the HFI Bylaws, and the BHS bylaws, BHS and HFI agreed that HFI would "realign its missions, focus and resource development role completely in support of the Barbershop Harmony Society programs." As part of that change, BHS gave HFI access to BHS's membership list and encouraged BHS members and BHS subsidiary districts, chapters, and quartets to donate in support of BHS and its programs through HFI.  Before and after these changes which occurred in 1997, BHS retained its governance rights, and HFI was and remained a related company to BHS.

25. In 1997, BHS also exercised further control over the permitted use of its HARMONY FOUNDATION® Mark by HFI as a related company to BHS.  Given the changes and new responsibilities for HFI referenced in the preceding paragraph, BHS entered into an agreement with HFI that expanded HFI's permitted use of the mark, so HFI could use the HARMONY FOUNDATION® Mark in connection with HFI's fund raising efforts directed at BHS members for the benefit and support of BHS and its programs.

26. Pursuant to the terms of the 1997 agreement, HFI was permitted to use the HARMONY FOUNDATION® Mark to raise funds for the benefit and support of BHS and its programs, provided: (a) use of the HARMONY FOUNDATION® Mark occurred in connection with fundraising directed at BHS members in an attempt to raise money for BHS, not HFI; (b) BHS remained in control of the use of the HARMONY FOUNDATION® Mark; (c) HFI's efforts and

permitted use of HARMONY FOUNDATION® Mark inured to the benefit of BHS; (d) HFI not

misuse the HARMONY FOUNDATION® Mark in a manner contrary to the interests of BHS; and

(e) HFI not misuse the HARMONY FOUNDATION® Mark in a manner to confuse or deceive

the public.

27. BHS also provided substantial financial support to make it possible for HFI to fundraise

on behalf of HFI. From 2002 through at least 2013, the payroll and benefits of all HFI employees

were paid by BHS and processed together with BHS's bi-weekly employee payroll as HFI hired

and employed fundraising staff and launched a capital campaign. Beginning in 2004, with the

financial backing of BHS, HFI launched an annual campaign to raise money from BHS's members.

BHS, for the next twelve years, fronted all of the payroll and benefit expenses of HFI. HFI in turn

"granted" BHS the money that was raised from BHS's members, which was used to pay BHS back

for the payroll expenses BHS had fronted HFI, together with certain funding to support BHS

programs.

28. As detailed in this Complaint, HFI has had and continues to have substantial difficulty

providing support to BHS and its programs because its high cost-structure is incommensurate with

the level of fundraising HFI has achieved. In fact, beginning in 2005, HFI invaded the corpus of

the endowment—officially taking a loan against endowment funds held for the benefit of BHS and

its members—to pay for its high overhead. By 2015, it was necessary for BHS to infuse $745,000

into HFI to bail HFI out and pay off the debt HFI owed against the endowment and other debt

instruments. BHS paid off HFI's debt using a program fund that BHS created in 2002, funded in

the amount of $1,497,000, and maintained with HFI to support BHS programs.

29. Between the twelve years of paying for HFI's payroll and the $745,000 bail out, BHS

provided the capital for HFI to initiate and for fourteen years run HFI's operation fundraising from

BHS's members.

30. Since 2015, HFI has continued to have an extraordinarily high cost of fundraising and overhead. Just 22 cents of every dollar raised have gone to BHS, and another 14 cents have gone to BHS's district and chapters. More than 63% of all money raised by HFI from BHS's members has gone to pay for HFI's own overhead—and the number is even worse than that considering that BHS continued to provide HFI with free rent, free utilities, free advertising in the BHS magazine, free access to BHS's updated membership lists, free use of certain of BHS's intellectual property and free premium tickets at BHS concerts to encourage donations. BHS even paid for HFI's insurance.

31. Beginning in 2017, the SBOD and BHS staff consistently and repeatedly asked Defendants to address HFI's exorbitant cost structure so that more of the money raised from BHS's members could go to programming. Defendants failed to address the problem.

32. The issue became even more acute in 2018 when BHS decided to become a co-ed organization by admitting women. Despite BHS's request that HFI develop a strategic plan for fundraising so that HFI could work with BHS in support of this historic change to the Society, Defendant Plaag and others acting in concert with him failed to do so.

33. The SBOD later sent HFI certain "needs documents," which again critiqued HFI's extraordinarily high cost of fundraising and set targets for how much money the SBOD expected to be available for BHS programs. Defendant Plaag and others acting in concert with him failed to respond to BHS's needs documents.

34. After nearly three years of seeking Defendants' cooperation to curtail HFI's high cost of fundraising, get a strategic plan for fundraising, and streamline messaging to members from the two organizations, all to no avail, the SBOD proposed that BHS and HFI work toward an end-state in which the HFI staff would come under the direction of the BHS CEO and redundancies in HFI's overhead would be eliminated so that the fundraising message to members could be aligned with

BHS's strategic purpose and programming and the cost of fundraising and operations would be commensurate with the level of giving historically seen from the BHS membership.

35. Once again, Defendant Plaag and others acting in concert with him failed to address this request.

36. Defendant Plaag is the current chairman of the HFI BoT, and he refused to work with the SBOD to curtail HFI's cost of fundraising, prepare a strategic plan, align messaging, respond to a BHS "needs document" detailing the funds BHS needed to support an expansion of programming, or make the end-state possible.

37. On information and belief, the other members of the HFI BoT were never fully informed by Defendant Plaag and others acting in concert with him about the SBOD's requests or the reasons therefore.

38. In light of that failure and the refusal of Defendants to address the problems with HFI, and mindful of its own fiduciary duties to BHS and the BHS membership, the SBOD amended the HFI Bylaws by expanding the size of the BoT from nine to twenty-five and elected sixteen new members to the HFI BoT ("New BoT Members" further-defined below) on March 22, 2020.

39. On behalf of the New BoT Members, Skipp Kropp wrote Plaag on April 2, 2020 to inform him of the changes to the BoT, to assert that the New BoT Members be recognized and included in HFI BoT meetings and decisions going forward, and to demand that HFI not expend any of HFI's resources without approval of a majority of all of the BoT.

40. Via counsel, Plaag responded that (i) he did not recognize Mr. Kropp or his colleagues as elected members of the HFI BoT, (ii) he and other BoT members acting in concert with him unilaterally were renouncing the Trust Agreement, and (iii) even HFI's own Bylaws were not valid such that he and others acting in concert with him purported to have the authority to elect the BoT going forward and to amend the HFI Bylaws without the SBOD's approval.

41. On July 17, 2020, BHS instructed Defendants to cease use of BHS's intellectual property and marketing assets. BHS's intellectual property includes, without limitation, the HARMONY FOUNDATION® Mark and the HARMONY FOUNDATION® Registration, which is conclusively owned by BHS.

42. Defendant Plaag and others acting in concert with him have refused to recognize the majority of the HFI BoT and have taken actions directly against the HFI Bylaws and the Trust Agreement and terms of the trust that exists over all property held by HFI:

    **a.**    Defendant Plaag and others acting in concert with him breached their fiduciary duties to HFI and BHS via their failure to address HFI's exorbitant fundraising and overhead costs;

    **b.**    On information and belief, Defendant Plaag and others acting in concert with him breached their fiduciary duties by giving HFI's CEO, Dr. Perry White, an employment contract on or about March 6, 2020, the terms of which cannot be justified given the exorbitant cost of HFI's fundraising and overhead and the failure of HFI to achieve a level of fundraising commensurate with those costs and/or with the terms of the employment contract given to Dr. White;

    **c.**    On information and belief, since March 22, 2020, Defendant Plaag has called and presided over multiple meetings alleged to be meetings of the HFI BoT. None of the New BoT Members were informed of or invited to attend those meetings.

    **d.**    On information and belief, since March 22, 2020, Defendant Plaag also has called and presided over multiple meetings alleged to be meetings of the HFI BoT but to which Martin Monson, the current CEO of BHS and an ex officio member of the HFI BoT was not invited.

e.    On information and belief, under the leadership of Defendant Plaag, a minority of the HFI BoT has taken actions against BHS allegedly in the name of HFI, including amending the HFI Bylaws.

f.    On information and belief, Defendants have attempted to, and have directed HFI representatives to, reject and disregard all controls sought to be exerted by BHS.

g.    On information and belief, Defendants have attempted to, and have directed HFI representatives to, use BHS's HARMONY FOUNDATION® Mark in ways that could be deceptive and are likely to deceive the public.

h.    On information and belief, Defendants have attempted to, and have directed HFI representatives to, use BHS's HARMONY FOUNDATION® Mark in ways that are not designed to inure to the benefit of BHS.

i.    On information and belief, Defendants have attempted to, and have directed HFI representatives to, use BHS's HARMONY FOUNDATION® Mark in ways that would violate the terms and conditions and exceed the scope of the permitted uses governed by the 1997 agreement between BHS and HFI.

j.    Defendant Plaag, and a minority of the HFI BoT, have purported to elect two new members and to re-elect one returning member to three year terms on the HFI BoT even though those members were never approved by a majority of the HFI BoT or elected by the SBOD.

k.    Defendants have explicitly renounced the trust that governs HFI, including the trust that exists over all property held by HFI or used by HFI.

l.    Defendant Plaag has engaged counsel and, together with a minority of the HFI BoT, on information and belief, has spent HFI's money—i.e. the money raised from BHS's members and held in trust, often in endowment funds, to benefit BHS and

its programs—to contest the authority of the majority of the HFI BoT as well as the powers held by the SBOD per HFI's Bylaws and the Trust Agreement.

43. HFI is represented and controlled by a majority of its BoT, not by Defendant Plaag and any minority of the HFI BoT that may wish to support him.

44. Among other things, Plaintiffs bring this Complaint to immediately and permanently enjoin the foregoing unlawful behavior of Plaag and those acting in concert with him.

45. Specifically, BHS and HFI seek a declaration that:

    **a.**    The HFI BoT comprises twenty-five elected members (16 New BoT Members as well as 9 incumbent BoT members), plus certain ex officio members;

    **b.**    In the alternative, and at a minimum, a majority of the SBOD has the power to amend the HFI Bylaws and Trust Agreement provided that any such amendment does not change the tenure, duties or liabilities of the BoT members;

    **c.**    In the alternative to (a) and (b), that the HFI Bylaws (i.e., those in effect as of March 22, 2020) remain the version of the HFI Bylaws in effect because the SBOD has not approved any amendments to the HFI Bylaws;

    **d.**    Per the HFI Bylaws, the SBOD, and only the SBOD, has the authority to elect the trustees of HFI, except for when filling interim positions;

    **e.**    Per the HFI Bylaws, the CEO of BHS is an ex officio member of the HFI BoT;

    **f.**    All property that has ever been conveyed, assigned, transferred and delivered to HFI by BHS or by any other organization or person, has been

and shall be held upon and subject to the trust set forth in the Trust Agreement, or, in the alternative;

**g.** A declaration of what property held by HFI is subject to the trust set forth in the Trust Agreement; and

**h.** Defendants have unlawfully attempted to, and/or directed HFI representatives to, use BHS's HARMONY FOUNDATION® Mark in ways that reject control by BHS and further violate the terms and conditions and exceed the scope of the 1997 agreement between BHS and HFI.

46. In addition, BHS and HFI seek an immediate preliminary injunction:

**a.** Prohibiting Defendant Plaag from holding additional HFI BoT meetings with anything less than a quorum of the full membership of all of the BoT (including the New BoT Members) or taking up any HFI business until this litigation is resolved except for (a) the business essential to maintain the daily operations of HFI during this litigation, and (b) meetings called for the express purpose of settling this dispute;

**b.** Prohibiting Defendant Plaag and others associated with him from using the name and the HARMONY FOUNDATION® Mark except for the legitimate business of HFI that is essential to maintain the daily operations of HFI during this litigation;

**c.** Prohibiting Defendant Plaag and others associated with him from seating or purporting to elect or re-elect any BoT members who were not elected or re-elected by the SBOD;

**d.** Prohibiting Defendant Plaag from using any money in a "legal defense fund" raised from BHS members or pre-existing HFI donors, whether raised

with or without use of the HARMONY FOUNDATION® Mark, to pay for litigation against Plaintiffs in this or any other matter;

e.      Prohibiting Defendant Plaag from expending any money from the corpus or taking any loan against the HFI endowed funds for any purpose during the pendency of this litigation, including but not limited to using such funds to pay for this litigation;

f.      Ordering that all monies in any "legal defense fund" either be given to Plaintiffs as the rightful majority of the HFI BoT to pursue this action or be set aside in escrow until this litigation is terminated;

g.      Ordering that all funds in the possession of HFI that have been raised from BHS members or pre-existing HFI donors must be set aside in escrow until this litigation is terminated and may not be used by Defendants or those associated with them to pay for this litigation except that HFI's staff shall be permitted to pay for the normal and ordinary business expenses of HFI, such as salaries and overhead from such funds.

h.      Prohibiting Defendant Plaag and those acting in concert with him from attempting to, and/or directing HFI representatives to use BHS's HARMONY FOUNDATION® Mark in ways that reject control by BHS and further violate the terms and conditions and exceed the scope of the 1997 agreement between BHS and HFI.

## **FACTUAL BACKGROUND**

47. The Barbershop Harmony Society began in 1938 as a group of men who gathered to sing songs in four part acapella style.

48. BHS was formally organized as an Oklahoma non-stock corporation on July 6, 1938. Since 1938, BHS became an Illinois corporation, and then moved to Wisconsin and become a Wisconsin corporation.

49. Today, BHS is a Wisconsin non-stock corporation. In 2008, BHS moved its headquarters to Nashville, Tennessee, but it did not reincorporate in Tennessee. On April 18, 2008, BHS received a Certificate of Authority to transact business as a non-profit corporation in Tennessee.

50. The purposes of BHS, as stated in the current BHS bylaws, include:

   **a.**   To perpetuate the old American institution: the barbershop quartet and barbershop harmony;

   **b.**   To promote the appreciation of barbershop harmony;

   **c.**   To initiate and maintain a broad program of musical education, contests, and appreciation in support of barbershop harmony and the allied arts;

   **d.**   To establish and maintain foundations that support our vision; and

   **e.**   To initiate, promote, and participate in charitable projects that support our vision.

51. BHS is governed by the SBOD, elected from the BHS membership ranks. The SBOD currently has ten members, plus a parliamentarian. In addition, the CEO of BHS and the CEO of HFI serve on the SBOD *ex officio.*

52. BHS is organized at the local level into chapters, and then a group of chapters combine to form a district. BHS has 17 districts in North America.

53. BHS puts on programming, such as conventions, singing competitions, music education, training and support services for music educators and directors, and youth outreach schools and camps. Singing competitions take place at both the district and international level.

### BHS Creates HFI

54. BHS originally established HFI in 1958 as a related company to be the charitable and philanthropic arm of the Society and to hold certain portions of the Society's property.

55. When the idea of creating HFI first emerged in 1958, the purposes of BHS, as stated in its then-operative bylaws, included "to initiate, promote, and participate in charitable and civic projects and to establish and maintain musical scholarships and charitable foundations."

56. On January 27, 1958, the SBOD received a proposal to create a trust foundation to be known as Harmony Foundation. The proposal noted that the trust foundation would follow the rules set by the donor, BHS, and would "carry out the corporate purposes of the Society while conserving" the Society's property. The proposal further noted that the income from the trust would be donated back to the Society. A true and correct copy of the proposal is attached hereto as **Exhibit E**.

57. At the BHS International Convention in 1959, BHS took steps to formalize the creation of HFI and the relationship between BHS and HFI.

58. First, on June 29, 1959, the SBOD created and approved the proposed bylaws of HFI. The proposed bylaws were written and approved by BHS before BHS members created HFI as a legal entity. A true and correct copy of the original bylaws of HFI is attached hereto as **Exhibit F** ("Original Bylaws").

59. The Original Bylaws anticipated the creation of a trust in favor of the Society and its purposes and the execution of a trust agreement to govern that relationship. A true and correct copy of that trust agreement is attached hereto as **Exhibit G** ("Original Trust Agreement"). The Original Bylaws expressly incorporated the Original Trust Agreement. Specifically, Article 3.04 of HFI's Original Bylaws states:

> It shall be the duty of the [BoT] to manage the trust estate in accordance with the provisions of the Trust Agreement, heretofore entered into by and between [HFI]

17

and the Society for the Preservation and Encouragement of Barber Shop Quartet Singing in America, Inc., . . . and to exercise such powers as are therein granted, ***said Trust Agreement hereby being adopted by reference and made a part of these By-Laws***. (emphasis added).

60. Therefore, before it created HFI, BHS promulgated and approved the Original Bylaws for HFI and expressly made the Original Trust Agreement a part of those Original Bylaws.

61. As described below, the Trust Agreement continues to expressly be adopted by and be a part of HFI's Bylaws.

62. BHS further made all amendments to the HFI Bylaws subject to approval by the SBOD. See Original Bylaws Article 11.01.

63. As originally constituted, the HFI BoT consisted of seven members, all of whom were past members of the SBOD, and at least five of whom had to be past Presidents of the SBOD. See Original Bylaws Article 3.01.

64. Four days later, on July 3, 1959, certain BHS members signed the HFI Corporate Charter, thereby creating HFI.

65. That same day, as HFI's first official action, BHS and HFI entered into the Original Trust Agreement that, in modified form, has governed the relationship between the two entities ever since.

66. As detailed later in this Complaint, the Original Trust Agreement created a trust, with HFI as the trustee, that remains in place today in the Trust Agreement.

67. Article VII of the Original Trust Agreement provides that:

"This trust agreement may be amended by majority vote of the Society Board of Directors, provided, however, that a favorable vote of a majority of both the Society Board of Directors and the [HFI BoT] shall be necessary to change the tenure, duties or liabilities of [the HFI BoT]."

68. Article VII of the Original Trust Agreement remains in the latest version of the Trust Agreement, unchanged.

69. On July 4, 1959, the HFI BoT adopted the Original Bylaws that the SBOD had approved on June 29, 1959.

70. Because the Original Trust Agreement was executed on the day HFI began to exist and has been a part of the HFI Bylaws since before HFI has existed, the right of BHS to amend the Trust Agreement, and therefore HFI's bylaws, has been a part of HFI's structure and corporate governance for its entire existence.

71. The persons who created HFI, did so knowing they were creating a non-stock non-profit charitable trust corporation with bylaws that expressly allow the SBOD to amend the bylaws.

72. Per Section 3.02 of the Original Bylaws and Section 3.02 of the HFI Bylaws in effect as of March 22, 2020, the SBOD has always had the right to elect members of HFI's BoT since HFI's inception.

73. This in turn creates a virtuous cycle of governance that has been in place since 1959:

    **a.**    HFI is the trustee corporation of a trust in favor of BHS, BHS's programs, and BHS-related endeavors—in other words, HFI is the trustee over a trust that benefits BHS's members;

    **b.**    HFI's donors are almost exclusively BHS members and their families;

    **c.**    BHS's members have a voice in choosing the SBOD;

    **d.**    The SBOD, in turn, elects the HFI BoT.

74. Therefore, the donors to the trust (i.e. BHS's members), because they have a say in selecting the SBOD also have a say over the election of HFI's BoT, the trustees of the trust to which they donate and from which they benefit. BHS and HFI worked according to this virtuous cycle of governance for over sixty years until Defendant Plaag renounced the Trust Agreement and acted unilaterally, with the support of a minority of the HFI BoT, to appoint new trustees that

were not appointed by the SBOD—and which by definition BHS's members / HFI's donors have no say in choosing.

**HFI Functions As BHS's Charitable and Philanthropic Arm**

75. From its creation in 1959, until 1997, HFI functioned without any employees as BHS's charitable and philanthropic arm.

76. On January 16, 1964, the IRS issued a ruling letter that HFI is exempt from Federal income tax as an organization described in section 501(c)(3) of the Internal Revenue Code, and that contributions to the Foundation are deductible by donors as provided in Section 170 of the Code.

77. BHS was granted 501(c)(3) federal tax-exempt status by the IRS in 1946, and later a group exemption that provides tax-exempt status to any BHS subordinate organization, such as BHS's districts and chapters.

78. Beginning in 1964, and continuing for approximately forty years, HFI supported the Institute for Logopedics, now known as Heartspring, which was the official charity of the Society.

79. Members would give money to HFI, which would in turn remit the money to Heartspring.

80. As set forth in the Original Trust Agreement, HFI also was created in part to hold BHS's assets, such as Harmony Hall—BHS's headquarters building—and the BHS Old Songs Library.

81. Therefore, during the period between 1959 and 1997, HFI's primary role was to be the repository of certain BHS assets. HFI held certain BHS property, and HFI received donations from BHS members that were then sent to support Heartspring, BHS's primary philanthropic endeavor.

82. Although there were some amendments to HFI's Original Bylaws and the Original Trust Agreement during the 1959 to 1997 time period, HFI did not have employees, and the HFI BoT continued to be almost exclusively past Presidents of the SBOD.

83. On October 3, 1974, BHS applied for federal registration of the HARMONY FOUNDATION® Mark, and on May 4, 1976, the USPTO granted to BHS the HARMONY FOUNDATION® Registration for the HARMONY FOUNDATION® Mark in connection with the HARMONY FOUNDATION Services.

84. In 1982, U.S. Reg. No. 1038974 for the HARMONY FOUNDATION® Mark became incontestable pursuant to 15 U.S.C. §1065, making the HARMONY FOUNDATION® Registration conclusive evidence of: (a) The validity of the HARMONY FOUNDATION® Mark and the HARMONY FOUNDATION® Registration, (b) BHS's ownership of the HARMONY FOUNDATION® Mark and the HARMONY FOUNDATION® Registration, and (c) BHS's exclusive right to use the HARMONY FOUNDATION® Mark in United States commerce.

85. Since 1982, the HARMONY FOUNDATION® Registration has been duly renewed by the USPTO for additional ten-year terms, on each of the following dates: August 29, 1996, July 10, 2006, and July 22, 2016, such that BHS's HARMONY FOUNDATION® Registration is not due for renewal again at the USPTO until May 4, 2026.

86. In 1990, BHS and HFI created an endowment program that ultimately led to the creation of the endowment that is now housed at HFI.

87. In that time period, BHS first created an Endowment Committee as a standing committee of the Society.

88. Subsequently, BHS adopted a gift policy. A true and correct copy of the gift policy is attached hereto as **Exhibit H**.

89. The gift policy states that, as of 1990,

    **a.**    it was the policy of BHS and HFI to encourage and accept gifts,

    **b.**    that gifts could be made to either BHS or HFI (§1.1),

    **c.**    that the persons responsible for accepting gifts on behalf of BHS or HFI were BHS's Executive Director, Director of Finance and Administration, or Director of Development of the SBOD of HFI BoT (§1.2),

    **d.**    and that BHS, HFI "and their agents will always seek to ensure that a donor's primary motive for making a gift is one of charitable intent; that is, to make a gift for the betterment of the Society." (§1.4).

90. Therefore, when the endowment was first set up, it was set up by BHS, for the benefit of BHS, with BHS staff being the persons who initially accepted gifts.

91. In 1991, the OC Cash Founders Club was established by BHS. This club recognized individuals who gave gifts of $1,000 or more to the BHS endowment.

92. At the time, the general endowment, which is now housed at HFI, was referred to as the "Society's Endowment Fund."

93. As the foregoing illustrates, prior to 1997, the connection between and roles of BHS and HFI were clear—BHS employees worked to raise money, which could be housed either with BHS or at HFI.

**HFI Reorganized to Fundraise for BHS**

94. Beginning with studies in 1996, and culminating in a report issued on July 18, 1997, BHS and HFI made plans for a "new" Harmony Foundation. A true and correct copy of the report, titled Harmony Foundation Strategic Plan and Background (the "1997 Report") is attached hereto as **Exhibit I**.

95. The 1997 Report confirms the facts stated above regarding the related company relationship between BHS and HFI before 1997:

a.     Harmony Foundation "has existed for almost forty years without a staff."

b.     "The seven immediate past presidents of the Society have served as [BoT members] and have effectively conducted the business of the Foundation."

c.     "[T]here has been an overlap of duties between the Society and the Foundation."

d.     BHS members "see fund raising coming at them from a number of directions—our service projects, the museum, the endowment fund, etc."

e.     Harmony Foundation's "role for the past thirty-eight years [had been] as a pass-through for monies to the Institute of Logopedics (now Heartspring), a repository of other Barbershoppers' donations, and an occasional source of funds for special Society projects."

96. The 1997 Report then explains why it was created and the rationale and role for the "new" Harmony Foundation:

a.     The SBOD appointed a task force to see ways HFI or another entity could "contribute to Society goals by providing a vehicle for soliciting, receiving, managing, and distributing charitable donations."

b.     The recommendation is that the "role of Harmony Foundation is ***to function as the fund raising arm of the Society*** in support of the Society's charitable and educational purposes, projects and programs. . ." (emphasis added)

c.     The recommendation is for the Society to operate Society programs, with funding coming in whole or in part through HFI.

d.     Fundraising from individuals or corporations would be coordinated through HFI, and "[h]enceforth, fund raising is to be the domain of HFI and program operation is to be the domain of the Society."

97. The prior history and 1997 Report thus illustrate what happened. Before 1997 BHS did its own fundraising, including for the Society's endowment fund. Then BHS decided it would revamp HFI and turn HFI into the "fundraising arm of the Society."

98. As the 1997 Report indicates, HFI proceeded to hire staff. In subsequent years, BHS also made certain amendments to the trust agreement / HFI bylaws, such that the new HFI's BoT consisted of nine members, at least five of whom must be BHS members, instead of being purely the past seven presidents of BHS.

99. Notably, however, while BHS made a decision to allow HFI to raise money from BHS's members for BHS's behalf, the Society did not relinquish its governance rights. The powers BHS enjoyed in the HFI bylaws remained, including the power to elect BoT members and the power—via the Trust Agreement as a part of HFI's Bylaws—to unilaterally amend the relationship.

100.   Just as BHS reorganized HFI in 1997 and made HFI into BHS's fundraising arm, by virtue of its governance rights, BHS retained the right to reorganize HFI again in a different fashion in the future.

**BHS Provides the Capital for HFI to Fundraise**

101.   In the first few years of the new HFI, BHS provided grants to HFI to hire staff and set up its fundraising operation.

102.   Then, on November 4, 2000, the SBOD approved the report and recommendation of a charitable mission task force. This task force, and its report, continued the work of the 1997 Report. A true and correct copy of the November 4, 2000 Charitable Mission Task Force Report and Recommendations (the "2000 Report") is attached hereto as **Exhibit J**.

103.    The 2000 Report's first recommendation noted that "fundraising should be focused through Harmony Foundation as the Society's own charity" and therefore recommended that BHS members, chapters, and quartets should be encouraged to support BHS by donating to HFI.

104.    Likewise, the report's second recommendation noted that chapter, district, and BHS leaders should continually support and promote HFI.

105.    Additionally, the 2000 Report noted in recommendation eight that:

[W]hile [BHS] and [HFI] exist as individual non-profit organizations, ***they are, in fact, one and the same for all intents and purposes.*** The overriding purpose of HFI is to raise funds for BHS causes and the Society's Charitable Mission, and to make grants to support the Society's Vision Statement. Therefore, it is recommended that the Society support and facilitate the Foundation's fund-raising efforts enthusiastically.

106.    By 2002, HFI was operating, as the 1997 Report and 2000 Report recommended, as BHS's fundraising arm.

107.    BHS and HFI amended the trust agreement and the HFI bylaws several times between 1997 and 2009 to reflect the new, expanded role of HFI.

108.    Prior to the dispute that led to this lawsuit, the Trust Agreement was last amended on January 29, 2009.

109.    Prior to the dispute that led to this lawsuit, HFI's Bylaws were last amended and approved by the SBOD on January 29, 2009.

110.    None of these amendments changed the right of the SBOD to elect the HFI BoT.

111.    Per the HFI Bylaws, HFI has a nominating committee that nominates persons to the HFI BoT.

112.    Section 5.01 of the HFI Bylaws also states that nominations "may also be made from the floor."

113.    The SBOD then elects the HFI BoT.

114.    From 2002 to 2014, all HFI staff were on BHS's payroll. BHS paid the payroll and benefits for HFI.

115.    HFI would then reimburse BHS for the costs of its payroll and benefits once it had raised sufficient money, though the repayment of the money BHS had provided was often much later.

116.    BHS thus acted almost like a bank to HFI. BHS paid for HFI's payroll and benefits and gave HFI the equivalent of an interest free loan. HFI then raised money from BHS's members. Once HFI had raised sufficient money from BHS's members, it paid BHS back for the money BHS had fronted.

117.    In this manner, BHS provided the capital for HFI to set up its fundraising operation and provided ongoing working capital for that operation for fourteen years.

118.    BHS also provided other benefits to HFI, including free rent, free or heavily subsidized utilities, free premium tickets at BHS events for large donors, free stage time at BHS events, and free advertising in the Harmonizer, BHS's magazine that is sent to all members.

119.    BHS even paid the premiums for HFI's insurance, in which HFI was a named insured on the Society's various insurance policies.

120.    Beginning in 1997, BHS also permitted HFI to use the HARMONY FOUNDATION® Mark, to raise funds for the benefit and support of BHS and its programs, provided: (a) use of the HARMONY FOUNDATION® Mark occurred in connection with fundraising directed at BHS members in an attempt to raise money for BHS, not HFI; (b) BHS remained in control of the use of the HARMONY FOUNDATION® Mark; (c) HFI's efforts and permitted use of HARMONY FOUNDATION® Mark inured to the benefit of BHS; and (d) HFI refrained from using the HARMONY FOUNDATION® Mark in a manner to deceive the public.

121.    Of course, one of the most valuable assets BHS provided to HFI beyond the permitted use of the HARMONY FOUNDATION® Mark was BHS's membership list, to give HFI a ready-made list of potential and recurring donors.

122.    The fact that BHS provided the working capital and so many free assets and resources to HFI so that HFI could raise money from BHS's own members illustrates the related company relationship between the organizations. BHS would never have provided for the expanded use of the HARMONY FOUNDATION® Mark or these other assets and resources to HFI unless BHS had the ultimate control over HFI and the relationship with HFI, as set out in the HFI Bylaws and the Trust Agreement.

123.    Nevertheless, despite all that was provided by BHS, HFI struggled to fund raise in a cost-appropriate manner.

124.    The cost of HFI's operation was so high that HFI ran deficits.

125.    On October 29, 2005, the HFI BoT passed a resolution authorizing HFI to borrow from the endowment.

126.    HFI took on debt. Specifically, HFI took a loan against the endowment to cover its operating expenses and the grants it was making to BHS.

127.    In effect, what HFI did was raid the principal of the endowment and put an IOU on its books. This, of course, had the effect of liquidating securities, so that the endowment did not enjoy market growth in light of this loan.

128.    In 2011, KraftCPA performed an audit of the endowment, such that HFI had to restate its 2009 audit.

129.    That same year, BHS and HFI created a finance task force to address HFI's accumulated debt.

130.    According to HFI's 2012 financials, at the end of that year, HFI had $1,462,000 in debt. This included $487,451 in accounts payable owed to BHS, $718,348 in the balance owed on loans taken against the endowment, a $174,000 payable line of credit, individual loans of $71,000, and $12,097 of other liabilities. A true and correct copy of the 2012 financials are attached hereto as **Exhibit K**.

131.    In 2012, BHS instructed HFI to stop granting BHS $500,000 per year, as had been HFI's practice at the time. HFI instead was instructed to grant just $325,000 to BHS. HFI was instructed by BHS to use the $175,000 difference to start paying down its debt.

132.    BHS would not have declined $175,000 in grant money if HFI were a truly separate, independent foundation offering a grant. BHS declined this grant money because it had a vested interest in HFI's success, since HFI is the fundraising arm of BHS.

133.    On December 26, 2002, BHS had given HFI $1.5 million that BHS had accrued over the years to create the BHS Program Fund, a fund held by HFI for the benefit of BHS and to be used to fund BHS's programming.

134.    In 2015, BHS approached HFI based upon concerns about the negative fundraising implications of the HFI's endowment loans and offered to draw down its Program Fund to help HFI pay off its debts.

135.    On April 2, 2015, BHS terminated the Program Fund to pay off HFI's debts. Specifically, on that day BHS gave HFI $745,000 so that HFI could pay off the loan it had taken against the endowment and other debt instruments.

136.    BHS would not have terminated its Program Fund and given HFI $745,000 unless BHS had the power and authority provided to BHS per the HFI Bylaws and the Trust Agreement.

### HFI Continues to Have a High Cost to Fundraise

137.    BHS members love Barbershopping and are generous donors.

138.    In its annual fundraising, HFI consistently brings in approximately $3.0 million per year from BHS members ($2.5 million in 2019).

139.    But in the time since BHS paid off HFI's debts in April of 2015, HFI has continued to have an extraordinarily high cost for fundraising.

140.    As reported in the audited HFI financial statements for the fiscal years ending September 30, 2015 through 2019, HFI received unrestricted donations and revenue totaling $15.14 million, of which $3.61 million (23.9%) was granted to BHS for programming, and $2.27 million (15.0%) was disbursed to chapters and districts as directed by a donor restriction called Donor Choice. The remaining $9.26 million (61.2%) was spent on overhead, fundraising and other purposes which did not benefit BHS programs or BHS's members, chapters and districts.

141.    Moreover, the foregoing amounts do not include the value of goods and services provided by BHS to HFI, including free rent, utilities, access to mailing lists, and preferential seating at BHS conventions for donors, among others.

142.    On average, HFI brings in between $2.5 and $3.0 million per year, but its costs exceed $1.7 million per year.

143.    The SBOD has been concerned for many years that if the BHS membership knew that more than 60 cents of every dollar was going simply to pay for HFI's salaries and other overhead, giving would dry up.

144.    As a result, for years the SBOD has asked Defendant Plaag and those acting in concert with him to either increase HFI fundraising or substantially decrease its overhead.

145.    Unfortunately, as detailed below, certain members of the HFI BoT, led by Defendant Plaag, together with certain HFI staff, have refused to work with the SBOD to curtail these costs and/or streamline operations. Defendants have now gone further and renounced the

Trust Agreement and taken actions expressly prohibited by HFI's own Bylaws, necessitating this lawsuit.

146.    BHS's members, therefore, are now acutely aware of the high costs of HFI's operation.

## BHS Goes Coed, and Defendants Refuse to Cooperate

147.    Although BHS currently counts approximately 15,000 loyal members, membership as a whole has been declining for many years, which Covid-19—and the related cancellations of in-person singing, rehearsals, and gatherings—has only exacerbated.

148.    The SBOD has made engagement with youth and others a central priority, as the SBOD seeks to grow the Society via new members and engaging a new generation in new ways.

149.    In 2012, Martin Monson became the new CEO of BHS.

150.    Under Mr. Monson's leadership, the SBOD has focused its efforts on increasing programming with a drive toward increasing membership, supporting singing community health, and identifying new ways to participate in the enjoyment and preservation of barbershop singing.

151.    After years of decline, since 2012 BHS has started to see positive responses and significant areas of growth.

152.    Since assuming the CEO position in August 2012, Mr. Monson has undertaken a long-term process of aligning the Society's assets — i.e., a deeply committed, highly motivated, and enthusiastic membership base — with its vision of bringing the joy of harmony singing to people of all ages around the world.

153.    In his time at BHS, Mr. Monson has built effective partnerships with leading music education organizations; harnessed the power of thousands of people-hours of volunteers; and placed the Society on a solid financial footing that positions it for significant growth investments.

154.    Working with the SBOD, Mr. Monson led a comprehensive strategic planning effort that was completed and rolled out in 2017.

155.    Since August of 2012, BHS's revenues have grown 23%.  A key growth area was the establishment of a new outreach department through which BHS assisted HFI in fundraising efforts and helped increase the philanthropic support coming from the BHS membership and singing community.

156.    During the global coronavirus pandemic, Mr. Monson also participated in a choral leadership group that brought together medical and science experts to humbly educate the global choral world about the challenges and risks to singing and possible infection.

157.    Harmony University ("HU") is BHS's flagship educational event, and attendance has nearly doubled after the decision to move the event to Belmont University in Nashville. Increased participation of BHS's membership and other singing communities from around the world has occurred, with an average of participants from fifteen countries attending.

158.    The most significant HU growth and impact has been the increase of choral music educators' attendance, with many choral educators attending on scholarship.  Scholarship funding has nearly doubled over the past eight years.

159.    Finally, BHS has a high school and youth program, Next Generation Barbershop ("NGB") Varsity and Junior Outreach, which has grown tremendously over the past five years, even with very modest funding.  Middle school and high school choirs from all over North America and across demographics participate in this annual event.  Participation has grown from less than 500 students to over 800 over the past few years.  NGB is the only festival in the world where a high school choir consisting of students with free and reduced lunch rates can attend at BHS's expense.

160.    As the foregoing illustrates, working with Mr. Monson, the SBOD has put enormous resources into substantial growth across numerous areas of the Society.

161.    Unfortunately, HFI did not achieve a commensurate rise in fundraising and has been unable to support the increase in programming.

162.    In 2018, the SBOD added to these efforts to grow membership and include new constituencies by voting to permit women to join BHS.

163.    The BHS Strategic Vision, Everyone in Harmony, and Strategic Plan involves, among other things:

      **a.**    admitting women as members of BHS,

      **b.**    permitting all-female chapters, quartets, and singing choruses,

      **c.**    permitting co-ed chapters, quartets, and singing choruses,

      **d.**    maintaining and expanding all-male chapters, quartets, and singing choruses for those who wish to remain all-male, and

      **e.**    singing competitions, to begin in 2021, for the all-male, all-female, and co-ed divisions.

164.    The Strategic Plan and Strategic Vision Everyone in Harmony is one of the most significant changes to the Society in its eighty-two years of existence.

165.    To that end, and knowing that messaging surrounding Everyone in Harmony and related programming would be important, Mr. Monson as BHS's CEO and the SBOD reached out to HFI to ask HFI to prepare a strategic plan for fundraising and to work to align messaging between the two organizations supporting BHS programming.

166.    In light of the long standing history of the two organizations being related companies and since HFI is BHS's fundraising arm, BHS desired that HFI contribute fundraising plans to the BHS Strategic Plan so that BHS and HFI could work collectively on fundraising.

167.    Despite repeated requests over three years, Defendant Plaag and those acting in concert with him never provided a strategic plan.

168.    In fact, Defendant Plaag and those acting in concert with him essentially did not even respond to BHS's requests.

169.    On information and belief, Defendant Plaag is opposed to admitting women to the Society.

170.    On information and belief, Defendant Plaag and those acting in concert with him did not present the need for a strategic plan or BHS's request to align messaging to the entire HFI BoT.

171.    Rather than support Everyone in Harmony and related programming, HFI staff instead were directed by those acting in concert with Defendant Plaag to raise additional money for the endowment to pay for HFI's own overhead.

172.    For example, in the July/August, 2018 edition of the *Harmonizer*, Carolyn Faulkenberry, the CFO of HFI published an article "Why is HFI's Endowment So Important?" In the article, Ms. Faulkenberry stated that for all donations to HFI to be disbursed in grants, it was necessary to first grow HFI's endowment to $40 million. Then, the article explained, the endowment could pay for HFI's overhead so that additional dollars raised could go to grants.

173.    This article represented a major change from prior practices.

    **a.**    The article referred to the endowment as HFI's endowment, when prior literature had explained that it is the Society's endowment.

    **b.**    More importantly, it evinced a plan to raise money to pay for HFI's overhead, instead of supporting BHS's programming and mission.

174.    The SBOD was very concerned by Ms. Faulkenberry's letter that showed a determination of HFI to raise money for its own overhead. The SBOD was especially concerned

to see such an emphasis on raising money for HFI's overhead when HFI had refused to work with BHS to curtail its exorbitant overhead costs, develop a strategic plan, support Everyone in Harmony, or work to align messaging.

175.    The SBOD was further concerned by a change HFI made in the Legacy of Harmony program, the program by which BHS members remember the Society upon their passing with gifts from their estates.

176.    As detailed in the trust allegations set forth in greater detail below, the funds given to HFI in the past, such as an endowment fund established by the Association of International Champions, were given explicitly "in trust."

177.    By 2018, however, HFI had removed the "in trust" language from the Legacy of Harmony donation fund. A true and correct copy of the Legacy of Harmony donation form, with the trust language removed is attached hereto as **Exhibit L**.

178.    Nevertheless, and as detailed further in the trust section below, all money given to HFI is held in trust per the terms of the Trust Agreement.

179.    By January of 2019, having made no progress despite years of requests, the SBOD decided to prepare a document for HFI showing BHS's needs for funding to support the increase in programming.

180.    The needs document was approved on May 21, 2019. It listed funding targets as part of the roll-out of Everyone in Harmony. It also emphasized the need to grow "our" (i.e. BHS's, not HFI's) endowment. A true and correct copy of the needs document is attached hereto as **Exhibit M**.

181.     BHS asked HFI to deliver approximately $1.5 million a year in funding.

182.    The SBOD was aware that annual giving from BHS members, as of 2018, was $3.0 million, which is substantially greater than the $1.5 million BHS sought.

183.    It is HFI's exorbitant overhead that currently prevents HFI from being able to deliver to BHS the amount of money targeted for Society expansion efforts.

184.    Since HFI refused to work with BHS, BHS was essentially asking HFI to, of its own initiative, find a way through either additional fundraising or less expensive overhead to deliver back to the Society a higher percentage of the annual amount raised from BHS's members.

185.    HFI refused to respond to the needs document.

186.    On information and belief, Defendants did not present the needs document to the entire HFI BoT.

187.    Instead, HFI cut the amount of money it typically granted to BHS by approximately 50%.

188.    After three years of Defendant Plaag and others acting in concert with him completely refusing to work with BHS—a refusal in fact to even talk constructively with BHS—in the middle of some of the largest and most important changes to the Society in a generation, BHS was left at an impasse. Its fundraising arm was not effectively fundraising, was not willing to even discuss possible changes to make the fundraising more cost efficient or effective, and far from curtailing expenses to increase grants to BHS was, in fact, substantially cutting the money to go to BHS programming.

**Defendants Renounce the Trust Agreement and Defy the HFI Bylaws**

189.    After twenty-two years—and despite all BHS had done to bail HFI out of debt, front the capital for fundraising, and provide access to its membership list and resources—HFI still had an exorbitantly high cost of fundraising.

190.    Moreover, Defendants had refused to do anything to address this high cost of fundraising, as BHS had requested.

191.    For many years, the HFI Nominating Committee had submitted a slate of nominees to BHS.

192.    The SBOD in turn unanimously elected the entire slate.

193.    The SBOD has the right, however, to vote down one or more of HFI's nominees.

194.    The SBOD also has the right, per HFI's Bylaws, to make nominations to HFI's BoT from the floor.

195.    After reviewing the Trust Agreement and HFI Bylaws, the SBOD further realized that it could amend the Trust Agreement and HFI's Bylaws provided that any amendment did not change the tenure, duties, or liabilities of BoT members.

196.    At the January, 2020 SBOD meeting, the re-election of Plaag was on the agenda.

197.    Given Plaag's abject refusal to work with BHS on Everyone in Harmony, the cost of fundraising, or aligning messaging, the SBOD was conflicted about whether to re-elect him.

198.    For the first time in memory, a BoT member was not unanimously elected. Rather, the vote for Mr. Plaag was six to four.

199.    The SBOD decided to inform Mr. Plaag just how close the election was and to tell him that his reappointment was an "olive branch" to inspire Mr. Plaag to work with BHS. Although the SBOD could have voted Mr. Plaag off of the HFI BoT, the SBOD reappointed him as a gesture of goodwill in the hope that he would change and start to work with BHS to address its concerns.

200.    The SBOD also decided that HFI might simply be unaware of the governance rights BHS has—which, as detailed above, have existed since the very beginning of HFI—to change the Trust Agreement and to nominate and elect members of HFI's BoT.

201.    Because the SBOD and HFI BoT all know each other, and in fact many SBOD and HFI BoT members have at various times served on each respective board, the SBOD decided it would "remove the personalities" from the room and instead planned for the SBOD's counsel to

meet with Jim Warner, a lawyer in private practice who was serving pro bono as HFI's General Counsel.

202.    BHS's hope was that Warner would review the plain and unambiguous language of the HFI Bylaws and Trust Agreement and would inform Defendant Plaag and other members of the HFI BoT that—after three years of obstruction and a complete refusal to work with BHS to align fundraising with the many programming and membership growth initiatives taking place—they should cooperate with the SBOD.

203.    The SBOD prepared a letter that outlined the end-state the SBOD hoped to achieve. In essence, the SBOD wanted an end-state that would align fundraising and programming by which HFI and BHS would remain legally separate institutions but would operate as one. A true and correct copy of the end-state letter, delivered to the BoT via its counsel, is attached hereto as **Exhibit N**.

204.    There were many means by which the end-state could be achieved, including by a simple agreement that the HFI CEO would report to the BHS CEO and follow BHS's direction in messaging fundraising in alignment with programming.

205.    In other words, just as BHS used its governance authority to reorganize HFI in 1997 to have HFI become the fundraising arm of BHS, after twenty-two years of failure and four years of abject refusal to cooperate and align messaging, the SBOD proposed to use its governance rights again to shift fundraising responsibilities back from HFI to BHS, at least in some form.

206.    In January and again on February 25, 2020, BHS's counsel expressly told Jim Warner, that the purpose of the meeting was so that Mr. Warner would use his influence to convince the HFI BoT to finally work with the SBOD.

207.    On information and belief, Defendants never informed the majority of the HFI BoT that the reason BHS's counsel was meeting with them was so that they would understand BHS's governance rights and agree to cooperate.

208.    To the contrary, Plaag and those acting in concert with him caused HFI to relay to the SBOD through counsel that HFI did not agree with BHS's position.

209.    Furthermore, on information and belief, within three days of BHS's counsel's meeting with Jim Warner, Defendant Plaag and those acting in concert with him caused references to BHS to be removed from HFI's website.

210.    On information and belief, Defendant Plaag disagreed with BHS's position. A majority of the HFI BoT was not consulted during the late-February / early-March time frame.

211.    On March 6-7, 2020, the HFI BoT had an in-person board meeting in Nashville, Tennessee.

212.    The SBOD appointed a task force that booked tickets and planned to travel to Nashville to discuss the governance issues with the HFI BoT to work towards the desired end-state.

213.    Plaag and those acting in concert with him caused HFI to relay to the SBOD through counsel that the HFI BoT would not even meet with the SBOD task force.

214.    On information and belief, Defendants Plaag and those acting in concert with him made the decision to refuse to meet with the SBOD task force. A majority of the HFI BoT was not informed of the SBOD's desire to work amicably toward the end-state or that the BHS task force had already booked tickets and hotel reservations, so it could travel and meet in person.

215.    Alas, the March 6-7, 2020 weekend was the last weekend before travel was interrupted by the coronavirus outbreak.

216.     While refusing to meet with BHS's task force, and unbeknownst to the SBOD, on information and belief, Defendant Plaag and those acting in concert with him purported to cause HFI to enter into an employment contract with HFI's CEO, Dr. Perry White.

217.     On information and belief, Dr. White's purported employment contract is excessive and does not provide HFI with fair consideration given HFI's high overhead costs.

218.     On information and belief, Plaag and those acting in concert with him purported to cause HFI to enter into Dr. White's employment contract with a subjective intent of obstructing BHS's governance rights—rather than a subjective intent of fulfilling their fiduciary duties to HFI or acting in the best interest of HFI or the best interests of BHS and the trust HFI oversees for the benefit of BHS and its broader mission—constituting a breach of fiduciary duties owed by Plaag and those acting in concert with him.

219.     Because the employment contract was entered via a violation of their fiduciary duties, Defendant Plaag and others acting in concert with him are liable for damages for the value of that contract.

220.     Following the refusal, yet again, of Plaag and those acting in concert with to cooperate with the SBOD, and in light of more than three years of obstruction, exorbitantly high costs of fundraising, and a failure to match fundraising with the increase in programming, the SBOD decided that it had no choice but to exercise its governance rights.

221.     On March 22, 2020, the SBOD amended HFI's Bylaws by amending the Trust Agreement pursuant to Article VII. A true and correct copy of the Amended and Restated Trust Agreement as of March 22, 2020 is attached hereto as **Exhibit O** ("Amended Bylaws").

222.     The Amended Bylaws did not change the tenure, duties, or responsibilities of the existing members of HFI's BoT.

223.    Rather, the SBOD's primary change was to increase the size of HFI's BoT from nine to twenty-five.

224.    That same day, the SBOD nominated and elected the sixteen New BoT Members to the HFI BoT.

225.    The New BoT Members are John Donehower, Blair Brown, Dick Powell, John Santora, Skipp Kropp, Bernard Priceman, Jeremy Alright, Jeremy Brann, Randy Loos, Larry Bomback, David Headtler, Steve Denino, Joe Berger, Dwayne Cooper, Christian Hunter, and Alan Lamson.

226.    On April 2, 2020, Skipp Kropp, the acting President of the SBOD and a member of the HFI BoT sent a message to Defendant Plaag and the entire HFI BoT informing them of the changes and the election of the New BoT Members. Mr. Kropp also informed all of the HFI BoT that to take action, the BoT needed a quorum of the full group of twenty-five Elected Trustees and that any actions taken without such a quorum would be unauthorized. A true and correct copy of Mr. Kropp's letter is attached hereto as **Exhibit P**.

227.    In addition to his letter to the HFI BoT, Mr. Kropp also sent a letter to Carolyn Faulkenberry, CFO of HFI, informing her of the election of the New BoT Members and advising her not to expend any of HFI's funds except those expenditures necessary to maintain the normal business operations of HFI. A true and correct copy of Mr. Kropp's letter to Ms. Faulkenberry is attached hereto as **Exhibit Q**.

228.    Finally, Mr. Kropp sent a letter to Overton Thompson, who had begun acting as outside counsel for HFI sometime prior to February 25, 2020. On information and belief, Mr. Thompson was engaged to represent HFI or the BoT. Mr. Thompson was not engaged to represent Plaag or other Defendants in their personal capacities.

229.   Mr. Kropp informed Mr. Thompson of the election of the New BoT Members, reminded him that Mr. Thompson represented the entire BoT, and stated that the BoT wished for Mr. Thompson to remain as their counsel. A true and correct copy of Mr. Kropp's letter to Mr. Thompson is attached hereto as **Exhibit R**.

230.   Defendant Plaag and those acting in concert with him did not recognize the New BoT Members.

231.   Neither Defendant Plaag nor anyone acting in concert with him has reached out to the New BoT Members to include them in the governance of HFI.

232.   On information and belief, Defendant Plaag called, and a minority of the HFI BoT participated, in purported meetings of the HFI BoT subsequent to March 22, 2020.

233.   The New BoT Members were not invited to participate in those meetings.

234.   Through counsel, Defendant Plaag and those acting in concert with him informed the SBOD that they were renouncing the Trust Agreement.

235.   On April 11, 2020, Defendant Plaag and a minority of the HFI BoT purported to amend HFI's Bylaws. A true and correct copy of these purportedly amended bylaws is attached hereto as **Exhibit S** (the "Purported Amended Bylaws").

236.   The SBOD did not approve these Purported Amended Bylaws. In fact, the SBOD was never even asked to approve the Purported Amended Bylaws and did not even learn that purported amendments had been made until July 15, 2020.

237.   Because the SBOD did not approve the Purported Amended Bylaws, even if the BoT could ignore BHS's Amended Bylaws, per Article 11.01 of HFI's Bylaws (i.e., those in effect since 2009 before either the Amended Bylaws or the Purported Amended Bylaws), the Purported Amended Bylaws are invalid because all such amendments must be approved by a majority of the SBOD. *See* HFI Bylaws Article 11.01.

238.    The purported amendments to HFI's Bylaws are therefore ineffective.

239.    Defendant Plaag did not tell the SBOD that he had purported to amend HFI's Bylaws.

240.    The SBOD learned of the Purported Amended Bylaws through HFI's counsel on July 15, 2020, when, via counsel, Marty Monson reached out to inquire about the next HFI board meeting, since Mr. Monson was an ex officio member of the BoT.

241.    The SBOD learned that Defendant Plaag had purported to amend the Bylaws to (a) remove the BHS CEO as an ex officio member, (b) to remove the SBOD's right to elect members of the BoT, and (c) remove the SBOD's right to approve amendments.

242.    Through counsel, the SBOD repeatedly informed Defendants Plaag and the minority of the HFI BoT acting in concert with him that the SBOD considered these actions ineffective.

243.    The SBOD has repeatedly reserved its right to enforce its governance rights. HFI has acknowledged that the SBOD reserved its rights.

244.    In June, BHS announced that it would begin its own operation to fundraise dollars from BHS members.

245.    On information and belief, the next day Defendant Plaag directed others to direct HFI staff to send out correspondence to thousands of donors, almost all of whom are BHS members and their families, and begin calls contesting BHS's right to fundraise for itself from its own members and encouraging donors to give to HFI and not to give to BHS.

246.    On information and belief, Defendant Plaag also directed others to direct HFI staff to send communications and make telephone calls to BHS's districts and chapter leaders contesting BHS's right to fundraise for itself from its own members and encouraging BHS's districts and chapters to fundraise via HFI instead of via BHS.

247.    Defendant Plaag directed HFI representatives to use BHS's HARMONY FOUNDATION® Mark and to take these actions via communications with BHS's members and directly contrary to the interests of BHS.

248.    The New BoT Members, comprising a majority of the HFI BoT were not consulted before HFI staff took these actions.

249.    On information and belief, Defendant Plaag spread false information to and shared confidential information with certain BHS members, including members of his own singing community, who then began a vicious and malicious social media campaign against BHS staff.

250.    On information and belief, BHS member Tyler Rackley knows Defendant Plaag. On information and belief. Mr. Rackley either is or has been in the same singing community with or is or has been in a quartet coached by Defendant Plaag.

251.    As an indication of the actions coordinated by Defendant Plaag against BHS and the SBOD, on July 16, 2020, BHS staff person Cassi Costoulas was CCed on an email with Keith Eckhardt and Mr. Rackley. A true and correct copy of the email is attached hereto as **Exhibit T**.

252.     In the email, Mr. Eckhardt speaks about how he plans to secretly record other BHS members who supported the SBOD position and then use those recordings to get these BHS members expelled from the Society. Mr. Rackley responds with legal advice about how Mr. Eckhardt can skirt criminal law violations and make these recordings.

253.    Mr. Rackley ends the chain with Mr. Eckhardt by exulting: "I think between you, me, HFI, and other people they [i.e. BHS / the SBOD] are going to have a lot of 'holes' in the ship they are trying to plug simultaneously."

254.    On information and belief. Defendant Plaag coordinated Mr. Rackley's efforts and encouraged Messieurs Rackley and Eckhardt to secretly record other BHS members.

255.     Following this repeated misuse of BHS's HARMONY FOUNDATION® Mark and other BHS intellectual property against BHS, on July 17, 2020, Dick Powell, the President of the SBOD sent Defendant Plaag as well as the members of the HFI BoT working in concert with them, a letter ordering that they cease and desist from using certain BHS assets, including BHS's intellectual property. A true and correct copy of the July 17, 2020 letter ("July 17 Letter") is attached hereto as **Exhibit U**.

256.     Included in BHS's intellectual property is the HARMONY FOUNDATION® Mark, which BHS owns.

257.     The July 17 Letter begins by repeating the SBOD's desire to work with HFI to increase fundraising and states that a "key component of the [BHS] strategic plan is the need to incorporate a fundraising strategy into the Society's programs that is focused on supporting the Society's impact in our communities."

258.     The July 17 Letter also complains about the unilateral actions that Defendant Plaag and certain members of the HFI BoT working in concert with him had taken, including the purported amendment to HFI's Bylaws, which BHS had just learned about.

259.     The letter goes on to note that the SBOD considers the Trust Agreement to still be in effect, that the Purported Amended Bylaws to the HFI Bylaws are invalid, and that the HFI BoT consists of the full twenty-five members, not just nine.

260.     The letter notes BHS "continue[s] to retain and reserve our rights to enforce these agreements in the future."

261.     Defendants continued to misuse BHS's intellectual property, including the HARMONY FOUNDATION® Mark owned by BHS, to promote interests counter to BHS, in violation of the 1997 agreement, and without the approval of the entire HFI BoT.

262.     Defendant Plaag responded to the July 17 Letter on October 12, 2020 and made some remarkable assertions denying the long-standing trust relationship between BHS and HFI, including that:

       **a.**     BHS membership data and members list were not provided to HFI in trust;

       **b.**     BHS marketing assets, photos, and other intellectual property was not limited when HFI was allowed to use it, and thus Defendants could continue to use that intellectual property of BHS despite the instruction to cease and desist.

263.     Defendant Plaag also denied the sixty-plus year subsidiary relationship between BHS and HFI and asserted that any further discussions between (i) Plaag and those acting in concert with him and (ii) the SBOD and majority of the HFI BoT "will be conducted as equals without BHS dictating to HFI what it can and cannot do."

264.     Defendant Plaag and those acting in concert with him, continue to misuse BHS's intellectual property (including its HARMONY FOUNDATION® Mark), BHS's membership lists, other intellectual property such as photos and videos, and more to fundraise from BHS's members and to act contrary to the wishes and instructions of BHS and the majority of the HFI BoT.

265.     Defendants' actions are causing confusion among the membership with regard to the relationship of HFI and BHS.

266.     This confusion is causing irreparable harm to BHS and HFI.

267.     Defendants' actions are creating ill-will among the membership and undermining all of the good that BHS has accomplished over the past eight years to grow its programming and reach out to new constituencies.

268.     This is causing irreparable harm to BHS.

269.    On information and belief, Defendant Plaag and those acting in concert with him have purported to cause HFI to pursue and enter into new relationships—including potentially new contractual relationships—to fundraise for other entities, such as an all-women's barbershop singing society.

270.    Defendant Plaag was never authorized by a majority of the HFI BoT to enter into these new relationships.

271.    BHS and HFI will be irreparably harmed if HFI has new contractual obligations contrary to the intent and language of the trust relationship between BHS and HFI and contrary to sixty years of practice.

272.    On information and belief, Defendant Plaag has directed HFI staff to pursue and potentially enter into new relationships—including potentially new contractual relationships—with BHS's district and chapters.

273.    On information and belief, part of the pursuit of these new relationships with BHS's districts and chapters includes Defendant Plaag directing HFI staff to make negative comments about BHS, BHS staff, and/or the SBOD.

274.    Defendant Plaag, and those acting in concert with him, is causing irreparable harm to BHS by damaging BHS's relationships with its own districts and chapters.

275.    Defendant Plaag was never authorized by a majority of the HFI BoT to pursue or enter into new relationships and/or contracts with BHS's district and chapters.

276.    On information and belief, following Defendants' actions renouncing the Trust Agreement, certain BHS members who had decided to support the Society in their last will and testament via the Legacy of Harmony program reached out to HFI staff to direct their legacy gift to BHS.

277.    On information and belief, Defendant Plaag and those acting in concert with him directed HFI staff to tell certain BHS members that the legacy gift was irrevocable to HFI and that they would have to speak with HFI's counsel.

278.    On information and belief, the total value of Legacy of Harmony gifts is estimated to exceed $10 million.

279.    Plaag and those acting in concert with him want to use these funds to pay for HFI's exorbitant overhead in perpetuity and maintain that they would control these funds without *any* accountability to honor BHS's donors' intent that intended their legacy gifts would benefit BHS and its programs.

280.    On information and belief, Defendants are trying to redirect BHS's endowment and the legacy gifts of BHS's members to use for their own purposes.

281.    On September 17, 2020, Defendant Plaag and those acting in concert with him, announced via email that a minority of the HFI BoT had elected two new trustees to the HFI BoT, whose terms are due to begin on January 1, 2021. A true and correct copy of the email announcing their election is attached hereto as **Exhibit V**.

282.    The two new trustees were not elected by the SBOD.

283.    The two new trustees were not even nominated by a majority of the HFI BoT.

284.    Per section 3.02 of HFI's Bylaws, their election is invalid.

285.    Both BHS and HFI will suffer irreparable harm if improperly elected trustees are allowed to take office.

286.    BHS and HFI have historically completed a joint audit.

287.    In 2019, the last joint audit, completed September 30, 2019, and approved in March, noted that: "The Foundation's Board consists of nine Trustees that are elected by the Board of Directors of Barbershop Harmony Society.  Therefore, the two organizations are considered to be

financially interrelated.   Accordingly, the Foundation is included in the consolidated financial statements of the Barbershop Harmony Society, which is the principal reporting entity."

288.    BHS and HFI cannot proceed with a joint audit until the governance rights at issue in this case are resolved.

289.    BHS and HFI will suffer irreparable harm if they are prevented from putting out financial statements, as required, on account of Defendants' actions.

290.    Because Defendant Plaag and those acting in concert with him have caused, are causing, and unless stopped will continue to cause such harm to both BHS and HFI, BHS and HFI (as represented by a majority of the HFI BoT) bring this cause of action.

### Allegations Related to the Trust

291.    The following factual allegations relate to BHS's claim, in the alternative, that there is a trust relationship between BHS and HFI and its request for a declaration from this Court outlining the contours of what property is included within that trust.

292.    BHS incorporates by reference paragraphs 1 through 291 above as if fully set forth herein.

293.    On July 3, 1959, BHS entered into the Original Trust Agreement with HFI as Trustee (the "Trust").

294.    BHS was the settlor/grantor of the Trust.

295.    HFI (the "Trustee") is described in the agreement as a "non-stock, non-profit, charitable trust corporation, organized under the laws of the State of Wisconsin."

296.    HFI's Articles of Incorporation were also signed on July 3, 1959.

297.    HFI's purposes as stated in its Articles of Incorporation are nearly identical to the purposes set out in Article II of the Original Trust Agreement. (See HFI's Articles of Incorporation dated July 3, 1959 at Art. 3.)

298.     HFI was formally incorporated in the state of Wisconsin on October 14, 1959, when its Articles of Incorporation were filed with the Wisconsin Secretary of State.

299.     HFI itself is governed by a Board of Trustees (i.e., the BoT).  Article V(1) of the Trust Agreement as amended January 29, 2009 and in effect as of March 22, 2020, provides that HFI's BoT shall consist of nine individuals selected by BHS and at least five of the trustees must be members of BHS.

300.     The Trust is also known as the "Harmony Foundation International, Inc."  In other words, the Trustee and the Trust are referred to by the same name in the Trust Agreement.

301.     On January 16, 1964, the IRS issued a determination letter holding that the Trust was exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code (the "Code"), and that contributions to the Trust are deductible by donors as provided in Section 170 of the Code.

302.     BHS's intent in creating the Trust in 1959 was to promote charitable and educational projects, protect corporate property from creditors, and prevent unnecessary spending by BHS members.

303.     The meeting minutes from BHS's 1959 Annual Convention further demonstrate BHS's intent to create a trust with HFI as Trustee. A copy of the meeting minutes are attached hereto as **Exhibit W**.

304.     The Trust was amended and restated on July 2, 1997.  BHS and HFI subsequently amended the Amended and Restated Trust Agreement four times on June 1, 2005, January 18, 2006, November 1, 2008, and January 29, 2009.

305.     Pursuant to Article VI of the Trust Agreement, the Trust is governed by the laws of the State of Wisconsin.

306.    Wisconsin recognizes that charitable trusts may be created for, among other reasons, the relief of poverty, the advancement of education, or "other purposes the achievement of which is beneficial to the community." Wis. St. Ann. § 701.0405(1).

307.    Article II of the Trust Agreement provides that the Trust shall be administered and operated exclusively for such educational and charitable purposes as the [HFI BoT], in its discretion, shall determine will best promote:

> (a) The performance and use of the musical talents and other resources of Society members, subordinate units and singing groups in support of charitable and educational institutions, community services, and civic projects, whose purposes are deemed by the [HFI BoT] to be consistent with the purposes of the [Trust], and by entertainment means, by direct money contributions or by grant or contribution of property.
> (b) The study, teaching, experimentation, practice, demonstration and performance of four-part vocal harmony known as Barbershop harmony, and to stimulate an interest in music and in lyrical and musical composition and arranging and the allied arts and to collaborate with other music educators for this purpose.
> (c) The establishment of music scholarships for needy, talented students.

Trust Agreement at Art. II(1).

308.    In other words, the Trust is to be administered for three purposes: (a) the support of BHS activities; (b) the study and development of Barbershop harmony and related arts; and (c) the establishment of music scholarships.

309.    BHS is a specifically named beneficiary of the Trust. The Trust contemplates that there may also be other beneficiaries selected in the Trustee's discretion, as was the case for thirty-six years with the Institute of Logopedics / Heartspring, but those beneficiaries are not named specifically.

310.    Article III(2) of the Trust Agreement provides that the Trust estate should not inure to the benefit of any person or organization except as contemplated by the purposes in Article 2:

> [n]o part of the principal or net earnings of the trust estate shall inure to the benefit of any person, institution, or organization, including the Society, its affiliated or subordinate units, chapters, or corporations, or to the Trustees or to any individual, except such as may be entitled thereto for the purposes set out in Article II or

subordinate units, chapters or corporations or the Trustees or any individual . . .

311.    The Trust may be amended by BHS, and specifically by a majority vote of BHS's Board of Directors, the SBOD, unless if the amendment modifies the tenure, duties, or liabilities of the Trustees, the BoT members, in which case HFI's consent is required. (Trust at Art. VII.)

312.    BHS and HFI have never entered into an agreement to terminate or revoke the Trust.

313.    The Trust Agreement does not give HFI authority to unilaterally terminate the Trust.

314.    Article VIII provides that if the Trust is voluntarily dissolved, all property held by the Trustee should be distributed to BHS or a similar exempt organization.

315.    HFI has not resigned as Trustee of the Trust.

316.    HFI has not been removed as Trustee of the Trust.

317.    For the past six decades, BHS and HFI have operated in a manner consistent with the terms of the Trust Agreement.

318.    By Schedule A to the Original Trust Agreement executed in 1959, BHS conveyed the following property to the Trust: (1) improved real estate known as 6315 Third Avenue, Kenosha and (2) the Old Songs Library, consisting of the original collection of the Society, the Wade Song Collection and the Ken Grant collection.

319.    Article IV of the Trust Agreement contemplates that other organizations and individuals may convey additional property to the Trust "to be taken and held subject to all the terms of this Restated Agreement."

320.    Over the past six decades, additional property was contributed to the Trust by BHS, other organizations, and individual donors.  Additional contributions were sometimes the result or byproduct of charitable solicitations by BHS and/or HFI.

321.    BHS has contributed millions of dollars to the Trust. In the past five years alone, through the rent, utilities, insurance and others benefits it provided HFI at no cost, BHS contributed an estimated $1.5 million—or $300,000 each year—to the Trust.  Before that BHS contributed the $745,000 to bail HFI out of debt in 2015, plus many additional years of free rent and other benefits.

322.    HFI has solicited donations from BHS members and others by holding itself out as Trustee of the Trust benefitting BHS. For example, on the Keep A Melody Ringing Memorial, HFI describes itself as Trustee: "Harmony Foundation was incorporated in 1959 as a nonprofit charitable trust corporation and serves as the official charity of [BHS]." A copy of the image of this memorial is attached hereto as **Exhibit X**.

323.    Other organizations also made contributions to the Trust. For example, on December 28, 1992, the Association of International Champions made a gift to "Harmony Foundation, Inc., a not-for-profit trust in the State of Wisconsin."  A copy of the Association of International Champions Endowment Fund Agreement is attached hereto as **Exhibit Y**.

324.    HFI also identified itself as Trustee of the Trust in its guidance to its own BoT and in its internal documents.  A copy of HFI's 2016 Trustee training materials is attached hereto as **Exhibit Z**.

325.    The Trust Agreement, and HFI's duty to administer the Trust in a manner that benefits BHS, is at the core of HFI's identity and existence.  *See* "Board of Trustee Information, Harmony Foundation International, Inc.," attached hereto as Exhibit Z (same as above).

326.    In fact, HFI described the Trust as "the separate educational and charitable subsidiary of the Society." *See* Exhibit Z.

327.    In 1997, the parties reiterated their understanding of the Trust relationship:

. . . The role of [the Trust] is to function as the fund raising arm of [BHS] in support of [BHS's] charitable and educational purposes, projects, and programs, to develop and manage [Trust] assets, and to administer grant applications and awards.  Fund raising involving solicitations from individual or corporate sources

Case: 3:20-cv-01073-slc   Document #: 1   Filed: 12/01/20   Page 53 of 77

must be coordinated through [the Trust].  The role of [BHS] is to operate [BHS] programs.  Funding for [BHS] programs may be provided, in whole or in part, through [the Trust] . . .

(G. Stamm, "The New Harmony Foundation: An Overview of a Beginning, July 17, 1997, attached hereto as **Exhibit AA**.)

328.    Following Mr. Stamm's memorandum and the recommendations of a special task force, in July 1997, the parties recommitted to the trust arrangement and entered into an amended and restated Trust Agreement, which they subsequently amended four times, reiterating their commitment to the Trust and its terms.

## COUNT I: BREACH OF FIDUCIARY DUTY
### (Plaintiff HFI Against Defendant Plaag and Those Acting In Concert With Him)

329.    Plaintiff HFI incorporates by reference paragraphs 1 through 328 above as if fully set forth herein.

330.    Defendant Plaag and those acting in concert with him owe fiduciary duties to HFI, including the duties of loyalty, care, and obedience.

331.    The duty of loyalty requires Defendant Plaag and those acting in concert with him to act in good faith.

332.    Directors and officers of non-profit organizations who breach their duty of loyalty risk both personal liability and punitive damages.

333.    The duty of care requires Defendant Plaag and those acting in concert with him to use the same degree of diligence, inquiry and skill in performing his duties as a prudent person would use in similar circumstances.

334.    Directors and officers who do not make informed, good-faith decisions to further the organization's purposes violate the duty of care and loyalty.

335.    The duty of obedience requires that Defendant Plaag carry out HFI's purposes as set out in its organizational documents.

53

336.    Directors and officers who do not use the organization's assets to further the organization's purposes as described in its organizational documents violate the duty of obedience.

337.    Defendant Plaag and those acting in concert with him breached their fiduciary duties of loyalty, care, and obedience to HFI when they repeatedly failed to make informed, good-faith decisions to further HFI's purposes and failed to use HFI's assets to further HFI's purposes as described in its Bylaws.

338.    For example, Defendant Plaag flagrantly ignored and disregarded HFI's duly elected New BoT Members and intentionally refused to notify or involve them in matters that fall within the province of HFI's BoT.

339.    Defendant Plaag coordinated an effort to unlawfully amend HFI's Bylaws, and then instructed other directors and officers to disregard HFI's lawful Amended Bylaws.

340.    Defendant Plaag encouraged, authorized, and directed wasteful spending on excessive overhead that consumed more than 63% of all money raised by HFI.

341.    Defendant Plaag encouraged, authorized, and directed the misuse of BHS's HARMONY FOUNDATION® Mark that violated the terms and conditions and exceeded the scope of the authorization BHS granted to HFI, and thereby put HFI's permission to use BHS's intellectual property at risk.

342.    As a direct and proximate result of breaches of fiduciary duties by Defendant Plaag and those acting in concert with him, HFI sustained damages well in excess of $75,000.

343.    Defendant Plaag and those acting in concert with him are liable to HFI for these damages.

## COUNT II: BREACH OF FIDUCIARY DUTY
### (Plaintiff BHS Against Defendant Plaag and Those Acting In Concert With Him)

344.    Plaintiff BHS incorporates by reference paragraphs 1 through 343 above as if fully set forth herein.

345.    Defendant Plaag and those acting in concert with him owe fiduciary duties to BHS, including the duty of loyalty.

346.    The duty of loyalty applies to employees and agents of the trustee as well as to the trustee employing them.

347.    The duty of loyalty requires Defendant Plaag and those acting in concert with him to act in good faith.

348.    Directors and officers of non-profit organizations who breach their duty of loyalty risk both personal liability and punitive damages.

349.    Defendant Plaag and those acting in concert with him breached their fiduciary duty of loyalty to BHS when they refused to acknowledge the binding nature of the Trust Agreement on HFI.

350.    In addition, Defendant Plaag and those acting in concert with him breached their duty of loyalty to BHS when they renounced and attempted to void HFI's obligations and fiduciary duties to BHS, its members, and other permissible beneficiaries which arise from the Trust Agreement.  Through these actions, Defendant Plaag and those acting in concert with him may expose HFI to liability for breach of fiduciary duty as to the Trust beneficiaries.

351.    Defendant Plaag and those acting in concert with him also breached their duty of loyalty by refusing to acknowledge that certain assets held by HFI are held by HFI solely in its capacity as trustee of the Trust, and Defendant Plaag and those acting in concert with him have attempted to convert Trust property into property owned by HFI.

352.     In addition, Defendant Plaag and those acting in concert with him breached their duty of loyalty by instructing HFI staff to instruct donors that their donations should be made to HFI individually, rather than to HFI as Trustee of the Trust, in violation of the terms of the Trust Agreement and its agreement with BHS regarding its membership list.

353.     Defendant Plaag and those acting in concert with him also breached their duty of loyalty by encouraging, authorizing, and directing the misuse of BHS's HARMONY FOUNDATION® Mark in a manner that violated the terms and conditions and exceeded the scope of the permission BHS granted to HFI, confused and deceived the public, and thereby putting BHS's intellectual property at risk.

354.     As a direct and proximate result of breaches of fiduciary duties by Plaag and those acting in concert with him, BHS sustained damages well in excess of $75,000.

355.     Defendant Plaag and those acting in concert with him are liable to BHS for these damages.

### COUNT III: VIOLATION OF WIS. STAT. § 181.0855(1)(d)
### (Plaintiff HFI Against Defendant Plaag and Those Acting In Concert With Him)

356.     Plaintiff HFI incorporates by reference paragraphs 1 through 355 above as if fully set forth herein.

357.     The foregoing breaches of his fiduciary duties owed to HFI and BHS by Plaag and those acting in concert with him constitute willful misconduct.

358.     For example, Defendant Plaag flagrantly ignored and disregarded the New BoT Members and intentionally refused to notify or involve them in matters that fall within the province of HFI's BoT.

359.     Defendant Plaag and those acting in concert with him coordinated an effort to unlawfully amend HFI's Bylaws, and then instructed other directors and officers to disregard HFI's lawful Amended Bylaws.

360.    Defendant Plaag and those acting in concert with him encouraged, authorized, and directed wasteful spending on excessive overhead that consumed more than 63% of all money raised by HFI.

361.    Defendant Plaag and those acting in concert with him encouraged, authorized, and directed the misuse of BHS's HARMONY FOUNDATION® Mark that violated the terms and conditions and exceeded the scope of the authorization BHS granted to HFI, and thereby put HFI's permission to use BHS's intellectual property at risk.

362.    Defendant Plaag and those acting in concert with him intentionally refused to acknowledge the binding nature of the Trust Agreement on HFI.

363.    Defendant Plaag and those acting in concert with him deliberately renounced and attempted to void HFI's obligations and fiduciary duties to BHS, its members, and other permissible beneficiaries which arise from the Trust Agreement.   Through these actions, Defendant Plaag and those acting in concert with him may expose HFI to liability for breach of fiduciary duty as to the Trust beneficiaries.

364.    Pursuant to Wisconsin Statutes 181.0855(1)(d), Defendant Plaag and those acting in concert with him are liable to HFI for damages arising from their breaches of and failures to perform his duties, because they constitute willful misconduct.

365.    As a direct and proximate result of willful misconduct by defendant Plaag and those acting in concert with him, HFI sustained damages well in excess of $75,000.

366.    Defendant Plaag is liable to HFI for these damages.

## COUNT IV: DECLARATORY JUDGMENT – NO RIGHT TO INDEMNIFICATION (HFI BYLAWS ART. III, SECS. 12.01 – 12.03 AND WIS. STAT. § 181.0872(2)(a)(4)) (Plaintiff HFI Against Defendant Plaag and Those Acting In Concert With Him)

367.    Plaintiff HFI incorporates by reference paragraphs 1 through 366 above as if fully set forth herein.

368.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§2201 and 2202, HFI seeks a declaration that Defendant Plaag and those acting in concert with him are not entitled to indemnification from HFI for the fees, costs, charges, disbursements, attorney fees, damages, and other expenses incurred in connection with this legal proceeding.

369.    There is an actual and definite controversy between HFI and Defendant Plaag related to Defendant Plaag's indemnification rights.

370.    The controversy involves the interpretation and construction of HFI's governing documents and Wisconsin statutory law.

371.    Article III, Sections 12.01 – 12.03 of HFI's Bylaws provide that an officer or director of HFI that is involved in a legal proceeding such as this one (the "Proceeding") shall not have the right to indemnification from HFI for the "fees, costs, charges, disbursements, attorney fees and other expenses incurred in connection with the Proceeding" if such a determination is made by a majority vote of a quorum of HFI's BoT.

372.    On December 1, 2020, a majority of a quorum of HFI's BoT determined that Defendant Plaag is not entitled to indemnification from HFI for fees, costs, charges, disbursements, attorney fees and other expenses he incurred, or may incur, in connection with this Proceeding.

373.    In addition, Wisconsin Statutes § 181.0872(2)(a)(4) provides that a director or officer of a corporation is not entitled to indemnity from the corporation if they incur liability because they breached or failed to perform a duty that was owed to the corporation, and the breach or failure to perform constitutes willful misconduct.

374.    The foregoing breaches of his fiduciary duties to HFI by Plaag and those acting in concert with him constitute willful misconduct; thus, they are not entitled to indemnification from HFI pursuant to Wis. Stat. § 181.0872(2)(a)(4).

375.    For example, Defendant Plaag flagrantly ignored and disregarded the New BoT Members and intentionally refused to notify or involve them in matters that fall within the province of HFI's BoT.

376.    Defendant Plaag and those acting in concert with him coordinated an effort to unlawfully amend HFI's Bylaws, and then instructed other directors and officers to disregard HFI's Amended Bylaws.

377.    Defendant Plaag and those acting in concert with him encouraged, authorized, and directed wasteful spending on excessive overhead that consumed more than 63% of all money raised by HFI.

378.    Defendant Plaag and those acting in concert with him encouraged, authorized, and directed the misuse of BHS's HARMONY FOUNDATION® Mark that violated the terms and conditions and exceeded the scope of the authorization BHS granted to HFI, and thereby put HFI's permission to use BHS's intellectual property at risk.

379.    Defendant Plaag and those acting in concert with him intentionally refused to acknowledge the binding nature of the Trust Agreement on HFI.

380.    Defendant Plaag and those acting in concert with him deliberately renounced and attempted to void HFI's obligations and fiduciary duties to BHS, its members, and other permissible beneficiaries which arise from the Trust Agreement.  Through these actions, Defendant Plaag and those acting in concert with him exposed HFI to significant legal liability for breach of fiduciary duty as to the Trust beneficiaries.

381.    HFI is entitled to a declaration of law from this Court that Defendant Plaag and those acting in concert with him are not entitled to receive indemnification from HFI for any and all fees, costs, charges, disbursements, attorney fees, damages, and other expenses he incurred, and/or will incur, in connection with this legal proceeding.

## COUNT V: DECLARATORY JUDGMENT – HFI BOT

382.     Plaintiffs incorporate by reference paragraphs 1 through 381 above as if fully set forth herein.

383.     This claim is brought on behalf of both BHS and HFI.

384.     Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§2201 and 2202, BHS and HFI seek a declaration that the Amended Bylaws and subsequent election of new trustees to the HFI BoT on March 22, 2020 are valid and that the HFI BoT's slate of Elected Trustees currently consists of John Donehower, Blair Brown, Dick Powell, John Santora, Skipp Kropp, Bernard Priceman, Jeremy Alright, Jeremy Brann, Randy Loos, Larry Bomback, David Headtler, Steve Denino, Joe Berger, Dwayne Cooper, Christian Hunter, and Alan Lamson in addition to Defendant Plaag, Mike Moisio, Debbie Cleveland, Kendall Williams, Don Laursen, Lynn Weaver, Don Lambert, Sherri Matthews, Dan Bell, Perry White (ex-officio) and Martin Monson (ex-officio).

385.     There is an actual and definite controversy between Plaintiffs and the Defendants related to the validity of the Amended Bylaws and the election of new trustees.

386.     The controversy involves the interpretation and construction of HFI's governing documents.

387.     The controversy between Plaintiffs and the Defendants is real and adverse. Plaintiffs' interests are in direct conflict with the Defendants' interests.

388.     Article 3.04 of the HFI Bylaws in effect as of March 22, 2020 provided: "It shall be the duty of the [BoT] to manage the trust estate in accordance with the provisions of the Trust Agreement entered into by and between the Foundation and the Society and to exercise such powers as are therein granted, said Trust Agreement (including any amendments or restatements

thereof now existing or hereafter made) hereby being adopted by reference and made a part of these Bylaws."

389.     By the plain and unambiguous terms of the HFI Bylaws, the Trust Agreement and any amendments to the Trust Agreement "now existing or hereafter made" are expressly made a part of the HFI Bylaws.

390.     Article VII of the Trust Agreement in effect as of March 22, 2020 provided: "This Restated Agreement may be amended by majority vote of the Society Board of Directors, provided, however, that a favorable vote of a majority of both the Society Board of Directors and the Foundation Board shall be necessary to change the tenure, duties or liabilities of Foundation Trustees."

391.     By the plain and unambiguous terms of the Trust Agreement, which is itself a part of the HFI Bylaws, the SBOD has the right to amend the Trust Agreement via a majority vote, provided that said amendment does not change the tenure, duties or liabilities of the HFI BoT.

392.     Article 3.04 of the HFI Bylaws further states that any amendments to the Trust Agreement "hereafter made" are made a part of the HFI Bylaws.

393.     Therefore, any amendment to the Trust Agreement by a majority of the SBOD are automatically a part of the HFI Bylaws, a document that governs HFI and is binding upon the BoT, provided said amendment does not change the tenure, duties or liabilities of the HFI BoT.

394.     As is its right, on March 22, 2020, by a 9-0 majority, the SBOD voted to amend the Trust Agreement.

395.     The amendments did not change the tenure, duties or liabilities of the HFI Trustees.

396.     Therefore, by the plain and unambiguous terms of the HFI Bylaws and the Trust Agreement, the amendment is valid.

397.    The amendment changed the size of HFI's BoT from nine to no less than five and no more than twenty-five.

398.    The amendment allows the SBOD to change the size of the HFI BoT at any time.

399.    The amendment states that to the extent anything in the Trust Agreement is inconsistent with anything else in the HFI Bylaws, the Trust Agreement shall control.

400.    Section 3.02 of the HFI Bylaws states that the HFI Trustees shall be elected by the SBOD.

401.    Section 5.01 of the HFI Bylaws states that HFI Trustees may be nominated from the floor of the SBOD.

402.    On March 22, the SBOD nominated sixteen new trustees from the floor and elected those sixteen new trustees.

403.    Per the plain and unambiguous terms of the HFI Bylaws and the Trust Agreement, the HFI BoT now consists of twenty-five members, the original nine plus the sixteen newly elected trustees.

404.    Defendants, however, have stated that the Amended Bylaws are not valid, and that the Trust Agreement is unenforceable.

405.    Defendants have renounced the Trust Agreement.

406.    Defendants do not have any authority, in law, equity, or otherwise to renounce the Trust Agreement.

407.    Plaintiffs consist of BHS which, via the SBOD amended the HFI Bylaws and Trust Agreement and elected the New BoT Members, and of HFI as represented by the sixteen New BoT Members who have been in office since March 22, 2020, but whose authority has not been recognized by Defendants.

408.    Plaintiffs are entitled to a declaration of law from this Court that the total number of Elected Trustees of the HFI BoT consists of twenty-five, the original nine plus the sixteen New BoT Members the SBOD nominated and elected after amending the HFI Bylaws.

**COUNT VI: DECLARATORY JUDGMENT – SBOD POWER TO AMEND**

409.    BHS incorporates by reference paragraphs 1 through 408 above as if fully set forth herein.

410.    This claim is brought by BHS only and in the alternative to Count V.

411.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§2201 and 2202, BHS seeks a declaration in the alternative that, if for any reason the election of the New BoT Members is found to be invalid by this Court, a majority of the SBOD nonetheless has the power to amend  HFI's Bylaws / the Trust Agreement provided that any such amendment does not change the tenure, duties or liabilities of the HFI Trustees.

412.    There is an actual and definite controversy between BHS and the Defendants related to the validity of the SBOD's power to amend the HFI Bylaws.

413.    The controversy involves the interpretation and construction of HFI's governing documents.

414.    The controversy between BHS and the Defendants is real and adverse.  BHS's interests are in direct conflict with the Defendants' interests.

415.    Article 3.04 of the HFI Bylaws in effect as of March 22, 2020 provided: "It shall be the duty of the Board to manage the trust estate in accordance with the provisions of the Trust Agreement entered into by and between the Foundation and the Society and to exercise such powers as are therein granted, said Trust Agreement (including any amendments or restatements thereof now existing or hereafter made) hereby being adopted by reference and made a part of these Bylaws."

416.    By the plain and unambiguous terms of the HFI Bylaws, the Trust Agreement and any amendments to the Trust Agreement "now existing or hereafter made" are expressly made a part of the HFI Bylaws.

417.    Article VII of the Trust Agreement in effect as of March 22, 2020 provided: "This Restated Agreement may be amended by majority vote of the Society Board of Directors, provided, however, that a favorable vote of a majority of both the Society Board of Directors [(the SBOD)] and the Foundation Board [(the BoT)] shall be necessary to change the tenure, duties or liabilities of Foundation Trustees."

418.    By the plain and unambiguous terms of the Trust Agreement, which is itself a part of the HFI Bylaws, the SBOD has the right to amend the Trust Agreement via a majority vote, provided that said amendment does not change the tenure, duties or liabilities of the HFI Trustees.

419.    Article 3.04 of the HFI Bylaws further states that any amendments to the Trust Agreement "hereafter made" are made a part of the HFI Bylaws.

420.    Therefore, any amendment to the Trust Agreement by a majority of the SBOD is automatically a part of the HFI Bylaws, a document that governs the HFI corporation and binds the BoT, provided said amendment does not change the tenure, duties or liabilities of HFI Trustees.

421.    Defendants have stated that BHS's power to make amendments is not valid and the Trust Agreement is unenforceable.

422.    Defendants have renounced the Trust Agreement.

423.    Defendants do not have any authority, in law, equity, or otherwise to renounce the Trust Agreement.

424.    BHS is entitled, in the alternative, to a declaration from this Court that a majority of the SBOD has the power to amend HFI's Bylaws by amending the Trust Agreement, which is

itself a part of HFI's Bylaws, provided that any such amendment does not change the tenure, duties or liabilities of the HFI Trustees.

## COUNT VII: DECLARATORY JUDGMENT – HFI BYLAWS

425.    BHS incorporates by reference paragraphs 1 through 424 above as if fully set forth therein.

426.    BHS brings this claim for itself only and in the alternative if this Court holds against BHS and HFI on the governance rights and election of new trustees set forth in Count V and against BHS in the governance rights set forth in Count VI.

427.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§2201 and 2202, BHS seeks a declaration in the alternative that, if for any reason the election of the new trustees to the HFI BoT is found to be invalid by this Court, a majority of the SBOD nonetheless has the power to amend  HFI's Bylaws / the Trust Agreement provided that any such amendment does not change the tenure, duties or liabilities of the HFI Trustees.

428.    There is an actual and definite controversy between BHS and the Defendants related to the validity of the SBOD's power to amend the HFI Bylaws.

429.    The controversy involves the interpretation and construction of HFI's governing documents.

430.    The controversy between BHS and the Defendants is real and adverse.  BHS's interests are in direct conflict with the Defendants' interests.

431.    Article 11.01 of the HFI Bylaws in effect as of March 22, 2020 state that amendments to the Bylaws are effective only upon "approval of such amendments by a majority vote of the Society Board of Directors."

432.    Article 3.01 of the HFI Bylaws in effect as of March 22, 2020 provides that the BHS executive director shall be an ex officio member of the HFI BoT.

433.     Article 3.02 of the HFI Bylaws in effect as of March 22, 2020 provides that all members of the BoT shall be elected by the SBOD.

434.     Article 5.01 of the HFI Bylaws in effect as of March 22, 2020 provides that nominations of the HFI Trustees may be made from the floor of the SBOD.

435.     Defendant Plaag, and other members of the HFI BoT acting in concert with him, claim to have amended the HFI Bylaws on April 11, 2020 to (a) remove the right of the BHS CEO to be an ex officio member of the HFI BoT, (b) to remove the right of the SBOD to elect HFI's Trustees, and (c) to remove BHS's right to approve any amendments to the Bylaws.

436.     The actions taken by Defendant Plaag and a minority of the HFI BoT are directly contrary to Article 11.01 of HFI's own Bylaws requiring that HFI get approval from a majority of the SBOD for any amendments.

437.     The Purported Amended Bylaws made on April 11, 2020 are therefore directly contrary to the Bylaws and are ineffective.

438.     BHS as a beneficiary of certain rights within the HFI Bylaws has standing to sue to enforce its rights.

439.     BHS is entitled to a declaration from this Court that the Purported Amended Bylaws are ineffective.

440.     BHS is further entitled to a declaration that, because the April 11, 2020 amendments are invalid, BHS retains the rights it had in HFI's Bylaws, including the right of the BHS CEO to be an ex officio member of the HFI BoT; the right in section 3.02 to elect HFI's Trustees; the right in 5.01 to nominate Trustees; and the right in section 11.01 to approve amendments.

## COUNT VIII: DECLARATORY JUDGMENT - TRUST

441.     BHS incorporates by reference paragraphs 1 through 440 above as if fully set forth therein.

442.    BHS brings this claim in addition and in the alternative to the claims related to governance rights set forth in Counts V-VII above.

443.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§2201 and 2202 and Wis. St. Ann. § 701.0405(3), BHS seeks a declaratory judgment that: (i) the Trust Agreement, as amended and restated as of January 29, 2009, is valid and enforceable under Wisconsin law; (ii) HFI is Trustee of the Trust and owes fiduciary duties to BHS as a beneficiary of the Trust; and (iii) the Trust estate includes all contributions of any kind to the Trust made by BHS, individual donors, and other organizations, whether or not such donations were solicited by HFI, all interest earned upon assets owned by the Trust, and all work product created by HFI employees for the benefit of the Trust and its beneficiaries.

444.    There is an actual and definite controversy between BHS and the Defendants related to the existence of the Trust, the assets held by the Trust, and the Defendants' obligation to manage the assets held by the Trust pursuant to the terms of the Trust Agreement.

445.    The controversy involves the interpretation and construction of the Trust Agreement.

446.    The controversy between BHS and the Defendants is real and adverse.  BHS's interests are in direct conflict with the Defendants' interests.

*(i) The Trust Agreement, as amended and restated as of January 29, 2009,*
*is valid and enforceable under Wisconsin Law*

447.    The Trust Agreement, as amended and restated as of January 29, 2009, is a valid and enforceable trust under Wisconsin law.

448.    Wis. St. Ann. § 701.0402 sets out the requirements for creation of a trust.  The Trust satisfies each and every statutory requirement.

449.    The Trust's settlor, BHS, had capacity and intent to create the Trust.

67

450.     Wisconsin recognizes that charitable trusts may be created for, among other reasons, the relief of poverty, the advancement of education or "other purposes the achievement of which is beneficial to the community." Wis. St. Ann. § 701.0405(1).

451.     BHS intended to create a Trust Foundation to promote charitable and educational projects, protect corporate property from creditors, and prevent unnecessary spending by BHS members.

452.     The meeting minutes from BHS's 1959 Annual Convention further demonstrate BHS's intent to create a trust with HFI as Trustee. (*See* Exhibit W.)

453.     The intent of BHS and HFI to create a charitable trust was clear in the Original Trust Agreement from 1959 and was subsequently reiterated on five occasions, each time the Trust Agreement was amended.

454.     Most recently, BHS and HFI reiterated their commitment to the Trust relationship by the January 29, 2009 amendment to the Trust.

455.     The Trust is a charitable trust, as defined by Wis. St. Ann. § 701.0405(1), and it also has at least one definite beneficiary—BHS. (Trust Agreement at Art. II.)

456.     HFI is Trustee of the Trust and has duties to perform.  Article III of the Trust Agreement sets forth in detail the standards for administration and distribution.  Article V of the Trust Agreement also sets forth the Trustee's powers with respect to administering and managing the Trust estate.

457.     While members of HFI's BoT may also be members of BHS, the Trustee and beneficiary of the Trust are different and distinct entities.

458.     BHS and HFI have operated pursuant to the Trust Agreement for more than six decades.

459.     HFI identified itself as Trustee of the Trust in its guidance to its own BoT and in its internal documents.   A copy of HFI's 2016 Trustee training materials is attached hereto as Exhibit Z.

460.     The Trust Agreement, and HFI's duty to administer the Trust in a manner that benefits BHS, is at the core of HFI's identity and existence.  *See* "Board of Trustee Information, Harmony Foundation International, Inc.," Exhibit Z.

461.     The Trust has not been terminated or revoked.  BHS and HFI have never entered into an agreement to terminate or revoke the Trust.  The Trust Agreement does not give HFI authority to unilaterally terminate the Trust.

*(ii) HFI is trustee of the Trust and owes fiduciary duties to BHS as a beneficiary of the Trust*

462.     The Trust Agreement appoints HFI as Trustee of the Trust.

463.     HFI is a not-for-profit trust corporation and exists to administer the assets held by the Trust.

464.     HFI has not resigned as Trustee of the Trust.

465.     HFI has not been removed as Trustee of the Trust.

466.     Pursuant to Wis. St. Ann. § 701.0801, HFI owes fiduciary duties to BHS as a beneficiary of the Trust.

467.     Pursuant to Article III(2) of the Trust, HFI is prohibited from administering the Trust in a manner that causes the Trust estate to inure to the benefit of HFI or its BoT.

*(iii) The Trust estate includes all contributions of any kind to the Trust*

468.     The Trust estate includes all property contributed to the Trust by BHS, including but not limited to: (1) improved real estate known as 6315 Third Avenue, Kenosha and (2) the Old Songs Library, consisting of the original collection of the Society, the Wade Song Collection and

the Ken Grant collection, which was conveyed to HFI as Trustee of the Trust by Schedule A to the Original Trust Agreement in 1959.

469.    BHS has made many additional contributions to HFI as Trustee of the Trust, all of which are considered part of the Trust estate and to be administered pursuant to the terms of the Trust Agreement pursuant to Article IV.

470.    BHS members and other individual donors have also made many additional contributions to HFI as Trustee of the Trust.  Those donors made contributions to the Trust because they understood it would benefit BHS and be administered pursuant to the Trust Agreement.

471.    Other organizations also made contributions to the Trust. For example, on December 28, 1992, the Association of International Champions made a gift to "Harmony Foundation, Inc., a not-for-profit trust in the State of Wisconsin." *See* Exhibit Y.

472.    Accordingly, all contributions to HFI by individual donors or other organizations are included in the Trust estate and pursuant to Article IV of the Trust Agreement, must be administered pursuant to the terms of the Trust Agreement.

473.    All interest earned on assets held by HFI as Trustee of the Trust is included in the Trust estate.

474.    All work product created by HFI employees for the benefit of the Trust or related to the Trust or its assets are included in the Trust estate.

### COUNT IX: DECLARATORY JUDGMENT – USE OF BHS TRADEMARK

475.    Plaintiff BHS incorporates by reference paragraphs 1 through 474 above as if fully set forth therein.

476.    BHS is the sole and conclusive owner of the incontestable HARMONY FOUNDATION® Registration and the HARMONY FOUNDATION® Mark.

477.    Beginning in 1997, HFI was authorized by BHS to use the HARMONY FOUNDATION® Mark to raise funds for the benefit and support of BHS and its programs, provided: (a) use of the HARMONY FOUNDATION® Mark occurred in connection with fundraising directed at BHS members in an attempt to raise money for BHS, not HFI; (b) BHS remained in control of the use of the HARMONY FOUNDATION® Mark; (c) HFI's efforts and permitted use of HARMONY FOUNDATION® Mark inured to the benefit of BHS; (d) HFI not misuse the HARMONY FOUNDATION® Mark in a manner contrary to the interests of BHS; and (e) HFI not misuse the HARMONY FOUNDATION® Mark in a manner to confuse or deceive the public.

478.    Defendant Plaag has directed HFI representatives to reject BHS's authority and control over the HARMONY FOUNDATION® Mark, and to disregard the terms and conditions under which BHS permitted HFI expanded use the HARMONY FOUNDATION® Mark.

479.    For example, beginning in or about February 2020, Defendant Plaag directed HFI representatives to change HFI's website and other marketing materials and begin using the HARMONY FOUNDATION® Mark without prominent references to BHS.

480.    Defendant Plaag and those acting in concert with him also directed HFI representatives to cease making the types of references to BHS made in Exhibit D.

481.    In addition, Defendant Plaag directed HFI representatives to misuse the HARMONY FOUNDATION® Mark to solicit money from BHS's members and encourage BHS's members to exclusively support HFI, and not give to BHS.

482.    For instance, a BHS member/donor wrote BHS into his will and attempted to make a $300,000 gift to BHS via the Trust.  Subsequently, Defendant Plaag directed HFI representatives to renounce the Trust.  Defendant Plaag then directed HFI representatives to misuse the HARMONY FOUNDATION® Mark when speaking to this BHS member/donor, and tell him that

his gift was binding and that he would have to "speak with HFI's counsel" if he still intended to direct his funds to BHS rather than HFI because the Trust had been renounced.

483.    In addition, Defendant Plaag directed HFI representatives to use the HARMONY FOUNDATION® Mark to help establish relationships, and enter into contracts, with local BHS chapters for the purpose of bypassing BHS's national organization and raising money directly for HFI.

484.    Upon information and belief, Defendant Plaag also directed HFI representatives to enter into new contracts and new relationships involving other singing groups, and misuse the HARMONY FOUNDATION® Mark to raise money for these other organizations without BHS's permission.

485.    In addition, Defendant Plaag directed HFI representatives to misuse the HARMONY FOUNDATION® Mark to raise money from BHS members for a "legal defense fund" for the purpose of maintaining a legal action against BHS.

486.    Defendant Plaag and others acting in concert with him are unlawfully attempting to, and directing HFI representatives to, misuse the HARMONY FOUNDATION® Mark in illegitimate ways that are no longer designed to inure to the benefit of BHS.

487.    Defendant Plaag and others acting in concert with him are unlawfully attempting to, and directing HFI representatives to, misuse the HARMONY FOUNDATION® Mark in illegitimate ways and that exceed the scope of and violate the conditions of use set by BHS.

488.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§2201 and 2202, BHS seeks a declaration that states Defendant Plaag has unlawfully rejected BHS's authority and control over the HARMONY FOUNDATION® Mark, and unlawfully attempted to, and/or directed HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways that are likely to confuse or deceive the public and that do not inure to the benefit of BHS and/or that

violate the terms and conditions and exceed the scope of the permission for HFI to use BHS's HARMONY FOUNDATION® Mark.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    That this Court enter judgment in favor of Plaintiffs and against Defendant Plaag and those acting in concert with him for breach of fiduciary duties, for damages in excess of $75,000, and for costs, attorney's fees, and prejudgment and post-judgment interest.

2.    That this Court issue a declaration that:

   a.   The HFI BoT consists of twenty-five elected members, as listed in this complaint, which comprise the total number of trustees elected as HFI Trustees by the SBOD, plus certain ex officio members;

   b.   In the alternative, and at a minimum, a majority of the SBOD has the power to amend the HFI Bylaws and Trust Agreement provided that any such amendment does not change the tenure, duties or liabilities of the HFI Trustees;

   c.   In the alternative to (a) and (b), that the version of the HFI Bylaws in effect as of March 22, 2020 remains the version of the HFI Bylaws in effect because the SBOD has not approved any amendments to the HFI Bylaws;

   d.   Per the HFI Bylaws, the SBOD, and only the SBOD, has the authority to elect the Trustees of HFI to the BoT, except for when filling interim positions;

   e.   Per the HFI Bylaws, any amendments to the Bylaws must be approved by a majority of the SBOD;

   f.   Per the HFI Bylaws, the CEO of BHS is an ex officio member of the HFI BoT;

g.  All property that has ever been conveyed, assigned, transferred and delivered to HFI by BHS or by any other organization or person, has been and shall be held upon and subject to the Trust set forth in the Trust Agreement, or, in the alternative,

h.  A declaration of what property held by HFI is subject to the Trust set forth in the Trust Agreement; and

i.  Defendants have unlawfully rejected BHS's authority and control over the HARMONY FOUNDATION® Mark;

j.  Defendants have unlawfully attempted to, and/or directed HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways that are contrary to the interests of BHS;

k.  Defendants have unlawfully attempted to, and/or directed HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways that are likely to confuse or deceive the public;

l.  Defendants have unlawfully attempted to, and/or directed HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways and that do not inure to the benefit of BHS;

m.  Defendants have unlawfully attempted to, and/or directed HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways and that violate the terms and conditions and exceed the scope of the permission for HFI to use BHS's HARMONY FOUNDATION® Mark.

3.  That this Court issue a preliminary injunction during the pendency of this litigation and order the following:

a.  Prohibiting Defendant Plaag from holding additional HFI BoT meetings with anything less than a quorum of the full membership of all of the Elected Trustees

of HFI or taking up any HFI business until this litigation is resolved except for (a) the business essential to maintain the daily operations of HFI, and (b) meetings called for the express purpose of settling this dispute;

b.  Prohibiting Defendant Plaag and others associated with him from using the name and the HARMONY FOUNDATION® Mark except for business essential to maintain the daily operations of HFI;

c.  Prohibiting Defendant Plaag and others associated with him from seating for new terms any trustees who were not elected by the SBOD;

d.  Prohibiting Defendants and HFI staff under their direction from entering into any new contracts or relationships, except for normal donations from existing donors, during the pendency of this litigation;

e.  Prohibiting Defendants from using any money in a "legal defense fund" raised from BHS members or pre-existing HFI donors, whether raised with or without use of the HARMONY FOUNDATION® Mark, to pay for litigation against Plaintiffs in this or any other matter;

f.  Prohibiting Defendants from expending any money from the corpus or taking any loan against the HFI endowed funds for any purpose during the pendency of this litigation, including but not limited to using such funds to pay for this litigation;

g.  Ordering that all monies in any "legal defense fund" either be given to Plaintiffs as the rightful majority of the HFI BoT to pursue this action or be set aside in escrow until this litigation is terminated;

h.  Ordering that all funds in the possession of HFI that have been raised from BHS members or pre-existing HFI donors must be set aside in escrow until this litigation is terminated and may not be used by Defendants or those associated with them to

pay for this litigation except that HFI's staff shall be permitted to pay for the normal and ordinary business expenses of HFI, such as salaries and overhead from such funds;

i.  Prohibiting Defendants from rejecting BHS's authority and control over the HARMONY FOUNDATION® Mark;

j.  Prohibiting Defendants from attempting to or directing HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways that are contrary to the interests of BHS;

k.  Prohibiting Defendants from attempting to or directing HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways that are likely to confuse or deceive the public;

l.  Prohibiting Defendants from attempting to or directing HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways and that do not inure to the benefit of BHS;

m. Prohibiting Defendants from attempting to or directing HFI representatives to, misuse the HARMONY FOUNDATION® Mark in ways and that violate the terms and conditions and exceed the scope of the permission for HFI to use BHS's HARMONY FOUNDATION® Mark.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues so triable.

Dated:  December 1, 2020                    Respectfully submitted,

                                             GREENBERG TRAURIG, LLP

                                             By: */s/  Craig S. Krummen*
                                             Craig S. Krummen (MN259081; admitted to practice in the Western District of Wisconsin on 12/14/2009)
90 South 7th Street, Suite 3500
Minneapolis, MN  55402
(612) 259-9719
krummenc@gtlaw.com

*Attorneys for Plaintiff Harmony Foundation International, Inc.*

AND

Eric G. Osborne (TN No. 29719)
*Pro Hac Vice Forthcoming*
SHERRARD ROE VOIGT HARBISON
150 3rd Avenue South, Ste. 1100
Nashville, Tennessee 37201
(615) 742-4200
(615) 742-4539 (fax)
eosborne@srvhlaw.com

*Attorneys for Plaintiff Society For The Preservation And Encouragement Of Barber Shop Quartet Singing In America, Inc.*